ACCEPTED
15-25-00013-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
3/17/2025 7:22 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00013-CV

# In the Fifteenth Court of Appeals
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
3/17/2025 7:22:01 PM
CHRISTOPHER A. PRINE
Clerk

STATE OF TEXAS, THE TEXAS FACILITIES COMMISSION, THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION, MIKE NOVAK, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE TFC, AND ROLLAND NILES, IN HIS OFFICIAL CAPACITY AS DEPUTY EXECUTIVE COMMISSIONER FOR THE SYSTEM SUPPORT SERVICES DIVISION OF THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION, *APPELLANTS,*

v.

BROADMOOR AUSTIN ASSOCIATES, A TEXAS JOINT VENTURE, *APPELLEE.*

On Appeal from Cause No. D-1-GN-23-007899
In the 455th Judicial District of Travis Count, Texas

## BRIEF OF APPELLANTS

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Ralph Molina
Deputy First Assistant Attorney
General

Austin Kinghorn
Deputy Attorney General for Civil
Litigation

Kimberly Gdula
Division Chief
General Litigation Division

Alyssa Bixby-Lawson
Assistant Attorney General
State Bar No. 24122680
Alyssa.Bixby-Lason@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (210) 270-1118
Fax: (512) 474-2697

Counsel for Appellants

**Oral Argument Requested**

# IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| **Appellants:** | The State of Texas, the Texas Facilities Commission ("TFC"), the Texas Health and Human Services Commission ("HHSC"), Mike Novak, in his Official capacity as Executive Director of TFC, and Rolland Niles, in his Official Capacity as Deputy Executive Commissioner for the System Support Services division of HHSC |
| **Appellate and Trial Counsel for Appellants:** | Ken Paxton<br>Brent Webster<br>Ralph Molina<br>Austin Kinghorn<br>Kimberly Gdula<br>Alyssa Bixby-Lawson (lead counsel)<br>Office of the Attorney General<br>General Litigation Division<br>P.O. Box 12548/Capitol Station<br>Austin, Texas 78711-2548<br>Alyssa.Bixby-Lawson@oag.texas.gov |
| **Appellee:** | Broadmoor Austin Associates, a Texas Joint Venture |
| **Appellate and Trial Counsel for Appellee:** | Jason LaFond<br>Casey L. Dobson<br>Sara W. Clark<br>Scott Douglass & McConnico, LLP<br>303 Colorado Street, Suite 2400<br>Austin, TX 78701<br>jlafond@scottdoug.com<br>cdobson@scottdoug.com<br>sclark@scottdoug.com |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ..................................................... 2

TABLE OF CONTENTS ............................................................................. 3

INDEX OF AUTHORITIES ........................................................................ 5

STATEMENT OF THE CASE ...................................................................... 8

STATEMENT REGARDING ORAL ARGUMENT ......................................... 9

ISSUES PRESENTED ................................................................................ 9

INTRODUCTION .................................................................................... 11

STATEMENT OF THE FACTS .................................................................13

A.  Factual History ...........................................................................13

B.  Procedural History......................................................................17

SUMMARY OF THE ARGUMENT ............................................................18

STANDARD OF REVIEW .......................................................................21

ARGUMENT ..........................................................................................21

A.  Appellee failed to plead a valid waiver of Appellants' sovereign immunity because no statutory waiver exists under Chapter 114 of the Civil Practices & Remedies Code............................................. 23

    1.  Chapter 114 does not waive immunity over the State. ................... 24

    2.  Chapter 114 does not waive immunity over HHSC or TFC. ............. 28

    3.  Appellee's claim is not within the scope of the limited waiver of sovereign immunity in Chapter 114........................................................28

    4.  Chapter 271 of the Texas Local Government Code does not apply. 32

B.  The trial court has no jurisdiction to consider Appellee's declaratory judgment claim because it does not fall within the scope of the waiver provided by the UDJA. ....................................... 34

C.  Appellee cannot establish jurisdiction over its *ultra vires* claim. ...... 39

    1.  Appellee has not pled facts establishing Executive Director Novak and Deputy Executive Commissioner Niles acted beyond the scope of their authority.........................................................................................39

    2.  Appellee has not established that Executive Director Novak or Deputy Executive Director Niles acted outside their legal authority. ... 43

3.  Appellee has failed to establish that Executive Director Novak and Deputy Executive Commissioner Niles failed to perform a purely ministerial act. ......................................................................... 46

4.  Appellee improperly seeks retrospective relief, which is outside the scope of the *ultra vires* exception. ....................................................... 48

CONCLUSION ............................................................................................ 51

CERTIFICATE OF SERVICE ...................................................................... 52

CERTIFICATE OF COMPLIANCE .............................................................. 53

APPENDIX ................................................................................................. 53

4

# INDEX OF AUTHORITIES

Cases

*Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives,*
647 S.W.3d 681 (Tex. 2022) ........................................................................ 11
*Andrade v. NAACP of Austin,*
345 S.W.3d 1 (Tex. 2011) ........................................................................... 39
Beacon Nat'l Ins. Co. v. Montemayor,
86 S.W.3d 260 (Tex. App.—Austin 2002, no pet.) .................................. 20
*Brooks v. Northglen Ass'n,*
141 S.W.3d 158 (Tex. 2004) ...................................................................... 36
*Byrdson Servs. LLC v. South East Texas Reg. Plan. Comm'n,*
516 S.W.3d 483 (Tex. 2016) ............................................................... 19, 29
*Chambers-Liberty Ctys. Navigation Dist. v. State,*
575 S.W.3d 339 (Tex. 2019) ................................................................. 11, 21
*Chenault v. Phillips,*
914 S.W.2d 140 (Tex. 1996) ...................................................................... 37
*City of Austin v. Utility Assocs., Inc.,*
517 S.W.3d 300 (Tex. App.—Austin 2017, pet. denied) .......................... 46
*City of Dallas v. Sabine River Auth. of Tex.,*
03-15-00371-CV, 2017 WL 2536882 (Tex. App.—Austin June 7, 2017, no
pet.)(mem. op.) ......................................................................................... 34
*City of El Paso,*
284 S.W.3d ................................................................................................. 35
*City of Houston v. Houston Mun. Emps. Pension Sys.,*
549 S.W.3d 566 (Tex. 2018) ................................................................ 41, 46
*Comm'n v. Little-Tex Insulation Co.,*
39 S.W.3d 591 (Tex. 2001) ........................................................................ 37
*Dallas Area Rapid Transit v. Whitley,*
104 S.W.3d 540 (Tex. 2003) ...................................................................... 22
*Fed. Mar. Comm'n v. S.C. State Ports Auth.,*
535 U.S. 743 (2002) ................................................................................... 21
*Hall v. McRaven,*
508 S.W.3d 232 (Tex. 2017) ........................................................... 40, 41, 43
Harlan v. Tex. Department of Insurance,
No. 01-14-00479-CV, 2016 WL 3476914 (Tex. App.—Houston [1st Dist.]
June 23, 2016, no pet.)( ............................................................................ 47
*Hartzell v. S.O.,*
672 S.W.3d 304 (Tex. 2023) ...................................................................... 50

*Heckman v. Williamson County,*
 369 S.W.3d 137 (Tex. 2012)..................................................................21
*Heinrich,*
 284 S.W.3d ....................................................... 12, 39, 46, 49
*Hoff,*
 153 S.W.3d (citation omitted) ............................................21
*Honors Acad., Inc. v. Texas Educ. Agency,*
 555 S.W.3d 54 (Tex. 2018) ................................................ 47
*Hoppenstein Props., Inc. v. McLennan Cnty. Appraisal Dist.,*
 341 S.W.3d 16 (Tex. App.—Waco 2010, pet. denied)...............................33
*Houston Belt & Terminal Railway Co. v. City of Houston,*
 487 S.W.3d 154 (Tex. 2016)............................................. 43, 45
*In re Smith,*
 333 S.W.3d 582 (Tex.2011) ............................................. 43
*Klumb v. Houston Mun. Emps. Pension Sys.,*
 458 S.W.3d 1 (Tex. 2015)...................................................11, 40
*Lone Starr Multi Theatres, Inc. v. State,*
 922 S.W.2d 295 (Tex. App.—Austin, 1996, no writ.) (citation omitted) .. 36
*Lubbock Cnty. Water Control & Imp. Dist. v. Church & Akin, L.L.C.,*
 442 S.W.3d 297 (Tex. 2014) .........................................30
*Narisi v. Legend Diversified Investments,*
 715 S.W.2d 49 (Tex. App.—Dallas 1986, writ ref'd n.r.e.)........................ 36
*Patel v. Tex. Dep't of Licensing and Regulation,*
 469 S.W.3d 69 (Tex. 2015) ................................................ 35
*Regulation v. Model Search Am., Inc.,*
 953 S.W.2d 289 (Tex. App.—Austin 1997, no writ) ................................ 47
*Seminole Tribe of Fla. v. Florida,*
 517 U.S. 44, 55, 59 (1996) ..................................................... 23
*Tabrizi v. City Austin,*
 551 S.W.3d 290 (Tex. App.—El Paso 2018, no pet.) ................................41
*Tex. A & M Univ. Sys. v. Koseoglu,*
 233 S.W.3d 835 (Tex. 2007)....................................................... 23
*Tex. Dep't of Parks & Wildlife v. Miranda,*
 133 S.W.3d 217 (Tex. 2004) ........................................ 11, 21, 22
*Tex. Dep't of Transp. v. Sefzik,*
 355 S.W.3d 618 (Tex. 2011) ..................................................passim
*Tex. Parks & Wildlife Dep't v. Sawyer Tr.,*
 354 S.W.3d 384 (Tex. 2011) ...........................................12, 19, 34
*Texas Dep't of Transp. v. Sunset Transp., Inc.,*
 357 S.W.3d 691 (Tex. App.—Austin 2011, no pet.)............................41, 42

*Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*,
 145 S.W.3d 170 (Tex. 2004) ..................................................................48
*Texas Logos, L.P. v. Texas Dep't of Transp.*,
 241 S.W.3d 105 (Tex. App.—Austin 2007, no pet.)..................................35
*Town of Shady Shores v. Swanson*,
 590 S.W.3d 544 (Tex. 2019) ...................................................................11
*Univ. of Incarnate Word*,
 602 S.W.3d (quotation omitted) ........................................................21, 22
*University of Texas at El Paso v. Herrera*,
 322 S.W.3d 192 (Tex. 2010) ...................................................................22
*W. Tex. Mun. Power Agency v. Republic Power Partners, L.P.*,
 428 S.W.3d 299 (Tex. App.—Amarillo 2014, no pet.) .............................23
*Wichita Falls State Hosp. v. Taylor*,
 106 S.W.3d 692 (Tex. 2003)..............................................................22, 27

Rules

Tex. Civ. Prac. & Rem. Code § 114.001(2) ......................................24, 26, 29
Tex. Civ. Prac. & Rem. Code § 114.001(3) ................................11, 18, 24, 26
Tex. Civ. Prac. & Rem. Code § 114.001, .002 ...................................................11
Tex. Civ. Prac. & Rem. Code § 114.002 ..........................................................26
Tex. Civ. Prac. & Rem. Code § 114.002, .003 ..................................................34
Tex. Civ. Prac. & Rem. Code § 37.003(a) .......................................................35
Tex. Civ. Prac. & Rem. Code § 37.006(b).......................................................34
Tex. Civ. Prac. & Rem. Code § 37.008.............................................................38
Tex. Civ. Prac. & Rem. Code §§ 114.001(3), .002, .003 ........................23, 24
Tex. Gov't Code § 2167.0021 ...................................................................42, 48
Tex. Gov't Code § 2167.055(a)..............................................................passim
Tex. Gov't Code § 2167.055(e)........................................................................26
Tex. Gov't Code §§ 2167.001.....................................................................25, 40
Tex. Gov't Code §523.0051.............................................................................44
Tex. Gov't Code 2167.101.................................................................40, 42, 44
Tex. Loc. Gov't Code 271.152 .........................................................................32

Texas Rule of Appellate Procedure 9.4(i)(1) ..............................................53
Texas Rule of Appellate Procedure 9.4(i)(2)...............................................53

# STATEMENT OF THE CASE

*Nature of the Case:* This is an interlocutory appeal from a denial-in-part of Appellants' plea to the jurisdiction. CR.611, 621–25. Appellee filed an action against the State of Texas, TFC, HHSC, Executive Director Mike Novak of TFC, and Deputy Executive Commission for System Support Services Division of HHSC Rolland Niles alleging causes of action for breach of lease, *ultra vires* conduct related to the termination of the lease, and declaratory relief. CR.264–340.

*Course of Proceedings:* Appellants filed their Second Amended Plea to the Jurisdiction on June 17, 2024. CR.374–414. Appellants' Plea to the Jurisdiction was heard on December 18, 2024. 3RR.1.

*Trial Court Disposition:* The Honorable Judge Laurie Eiserloh, 455th Judicial District Court, Travis County, entered an Order on January 8, 2025, granting in part and denying in part Appellants' plea to the jurisdiction. CR.611. Appellants timely filed their notice of interlocutory appeal on January 23, 2025, pursuant to Texas Rules of Appellate Procedure Rule 4.2. CR.621–25.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. This is an appeal of a district court's order denying in part the State of Texas and its arms' sovereign immunity from claims for breach of contract and declaratory judgment under Chapters 114 and 37 of the Texas Civil Practices & Remedies Code and the *ultra vires* exception to sovereign immunity for their executive officers' actions. The interpretation of Chapter 114 as it applies to the State of Texas as a lessee and TFC as a representative agency acting on behalf of the State and how it applies to a breach of a rental covenant is an issue of first impression. Appellants respectfully submit that oral argument will materially assist the Court in its resolution of this appeal.

## ISSUES PRESENTED

The issues presented are:

1. Whether sovereign immunity precludes Appellee from bringing a breach of lease claim under Chapter 114 of the Texas Civil Practices & Remedies Code as it does not fall within the scope of the waiver contemplated by Chapter 114?

2. Whether sovereign immunity precludes Appellee from bringing a Chapter 37 claim for declaratory judgment against Appellants as it does not fall within the scope of waiver contemplated by the UDJA?

3.    Whether the *ultra vires* exception to sovereign immunity applies to Appellee's claims for actions taken by the State officials in their official capacities?

**TO THE HONORABLE FIFTEENTH COURT OF APPEALS:**

Jurisdiction "is essential to the court's power to decide a case." *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 8 (Tex. 2015) (quoting *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)). When a governmental entity challenges subject-matter jurisdiction in a plea to the jurisdiction, as Appellants did here, courts must assure themselves of their jurisdiction. *Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives*, 647 S.W.3d 681, 699 n.8 (Tex. 2022). That "jurisdictional inquiry may unavoidably implicate the underlying substantive merits of the case." *Chambers-Liberty Ctys. Navigation Dist. v. State*, 575 S.W.3d 339, 345 (Tex. 2019). But that does not change that the "plaintiff has the burden to affirmatively demonstrate the trial court's jurisdiction." *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019).

Appellee has failed to meet that burden for several reasons. First, the State of Texas is the Lessee under the Lease and Texas Government Code 2167.055(a), and the State cannot be sued under Chapter 114 of the Texas Civil Practice and Remedies Code. Tex. Civ. Prac. & Rem. Code § 114.001(3). Chapter 114 does not waive sovereign immunity for TFC and HHSC, which are not parties to the Lease. Chapter 114 also does not waive sovereign immunity because Appellee's breach of lease claim does not fall under the limited waiver of sovereign immunity, because the lease is not a contract for goods or services, specifically engineering, architectural, or construction services. Tex. Civ. Prac. & Rem. Code § 114.001, .002.

11

Second, Appellee has not challenged the constitutionality of a statute or law, and Texas has not consented to suits for a declaration of rights against state entities. *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011) ("[T]here is no general right to sue a state agency for a declaration of rights."). Texas jurisprudence is clear: declaratory judgment claims against governmental units are generally limited to declarations as to the constitutionality or invalidity of a statute or ordinance. *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 (Tex. 2011). Here, Appellee only seeks an interpretation of a legislative appropriation bill. Put simply, Appellee cannot create a cause of action against Appellants for which none exists, and the trial court erred by holding otherwise.

Third, Appellee fails to prove the *ultra vires* exception to sovereign immunity applies to the state officials in this suit. Each of the issues raised by Appellee in its petition relates to the exercise of discretion in how an executive agency manages its budget and allocates and distributes appropriated funds among various objectives. The fact that certain state officials who work for HHSC would act within their authority to determine that the monies allocated by the Legislature in any given biennium are not sufficient to pay for a lease without sacrificing other line-item costs or expenses, does not create an *ultra vires* claim. *Heinrich*, 284 S.W.3d at 372.

Lastly, Appellee seeks an award of retrospective damages to be made whole for the completed, past, non-recurring "harm" of the termination of the Lease. The requested relief would require undoing a previous decision

made by the State to terminate the Lease, and if granted, the requested relief would involve impermissible interference by the judiciary into the affairs of HHSC and TFC, in violation of the Constitutional principle of separation of powers.

## STATEMENT OF THE FACTS

### A. Factual History

On August 22, 2014, the State of Texas entered into a lease with Appellee for 122,213 square feet of office space located at 11501 Burnet Road, in Austin, Texas. (the "Lease"). CR.267. The Lease was entered into by the State of Texas (the "Lessee") for the occupying agency, HHSC. CR.267, 282, 289. The Lease was executed by an authorized representative of TFC. CR.289. TFC acts as an agent for the State and runs the State Leasing Services program, which procures and manages leased facilities to meet state agencies operational needs throughout the State of Texas. CR.431.

The Lease entered was for 120-month lease term ending on July 31, 2025. CR.267. On April 17, 2015, the parties changed the Lease Termination Date to October 31, 2025. *Id.* On July 2, 2015, the parties agreed to extend the terms of the Lease to terminate on October 31, 2026. CR.267-77.

Section 7(l) of the lease contains a remedy in the event the Lessee fails to pay rent:

> If Lessee fails to pay rentals or other charges hereunder or otherwise fails to perform its obligations hereunder and this failure is not cured within 30 days after written notice from Lessor to Lessee of such failure, then Lessee is in default, and Lessor may terminate this Lease and may enter

and take possession of premises, and will have the remedies now or hereafter provided by law for recovery of rent, repossession of premises and damages occasioned by Lessee's default.

No provision, covenant or agreement contained in this Lease shall be deemed a waiver of sovereign immunity of the State of Texas from tort or other liability.

CR.285. That same section also includes a clause that allows the Lessee to terminate the Lease:

This lease contract is made and entered into in accordance with and subject to the provisions of the Texas Constitution and the Texas Government Code, Title 10, Subtitle D, and *is made contingent upon the continuation of the availability of money appropriated by the legislature to pay for the lease*.

In the event the Legislature or the Executive Branch of the State of Texas cease to fund the lease,  . . . then the Texas Facilities Commission, hereinafter referred to as Commission, may assign another state agency with comparable use . . . to the space, or a part thereof, covered by this lease. Should the Commission be unable to find another State agency or agencies to fill, or partially fill the space, the Commission, upon written notice to the Lessor, either may terminate this lease, or sublet in whole or in part to a private third party.

CR.283 (emphasis added).

The Lease further requires certain things before the occupying agency could move in. The Lease states: "SUBJECT TO LESSEE DELAYS AND JUSTIFIABLE DELAYS, ALL CONSTRUCTION, REPAIRS AND ALTERATIONS shall be substantially completed by Lessor 120 days prior to the Rent Commencement Date." CR.291. If Lessor had failed to timely achieve Substantial Completion, pursuant to that provision, the Lessor could have been "liable to

14

Lessee in damages." *Id.* The Lessee was not obligated, under the Lease, to pay rent or other sums under the Lease until 120 days after Substantial Completion. *Id.* Appellee and the State of Texas, signed a Lease Extension Amendment on July 2, 2014, executed by its authorized representative from TFC, which states that "Lessor shall pay for up to $560,000.00 of Approved Change Orders and Approved Additional Work." CR.314.

On September 9, 2022, HHSC submitted its Legislative Appropriations Request for the 2024-2025 biennium. CR.270. The request includes a lump sum request for the category "Rent - Building" for the 2024 and 2025 fiscal years in the amount of $105,369,343 and $105,245,466, respectively. CR.270. HHSC also requested additional funds for an anticipated 9.9% increase in lease costs. CR.270.

The State's General Appropriations Act[1] appropriated amounts for the category "Rent – Building" for HHSC in the amount of $118,826,243 for the 2024 fiscal year and $119,751,160 for the 2025 fiscal year. CR.272. HB 1 included a provision that $12,275,361 had been appropriated for each upcoming fiscal year for HHSC "for cost increases for state leases." *Id.*

On May 31, 2023, HHSC sent a request to TFC in which it asked TFC to terminate the Lease "due to the non-availability of money, either appropriated by the legislature or funded by grants, to pay for the leased premises. CR.316-318. Based on this request, on June 1, 2023, TFC's Executive Director

---

[1] HB 1 was signed into law as the State's General Appropriations Act on June 18, 2023.

Novak sent a notice of termination of lease letter to Appellee. CR.320. The letter states the lease is being terminated "due to the non-availability of money . . . to pay for the leased premises." *Id.* The letter further states that HHSC "has directed that rent will not be certified for the biennium beginning September 1, 2023, as required by Section 2167.101, Texas Government Code," and that TFC has been unable to find another State agency or agencies to fill or partially fill the leased premises. *Id.*

On July 27, 2023, Deputy Executive Commissioner Niles sent a "Certification of Funds" for the 2024-25 biennium to TFC, based on Texas Government Code, Title 10, Chapter 2167, Sec., 2167.101, Certification of Available Money, "A state agency occupying space leased under this chapter shall certify to the commission, at least 60 days before the beginning of each fiscal biennium during the lease term, that money is available to pay for the leases until the end of the next fiscal biennium." CR.330. The letter states that HHSC reviewed the spreadsheet of leases provided by TFC, and that five leases will no longer be active after August 31, 2023, one of which is the lease at issue in this appeal. *Id.* Deputy Executive Commissioner Niles then stated that the active leases total $93,767,377.36 annually for the fiscal year 2024-2025 biennium, and HHSC certifies the funds will be available for each lease—other than the five identified. *Id.* On July 27, 2023, Executive Director Novak confirmed in a memorandum that he construed HHSC's letter as having "directed that rent would not be certified for the biennium beginning September 1, 2023" for the Appellee's Lease. CR.339.

16

## B. Procedural History

Appellee filed an action against the State of Texas, TFC, HHSC, Executive Director Novak, and Deputy Executive Commissioner Niles[2] alleging causes of action for breach of lease, *ultra vires* conduct related to the termination of the lease, and declaratory relief. CR.264-340. In its petition, Appellee demands the Court order the following relief:

- declare that the 88th Texas Legislature appropriated sufficient funds to pay for the Lease;

- issue an injunction mandating Deputy Executive Commissioner Niles certify to TFC that the Legislature appropriated sufficient funds to pay the Lease;

- issue an injunction mandating Executive Director Novak withdraw the notice of termination of the Lease;

- issue an injunction mandating Executive Director Novak comply with TFC statutes;

- order retroactive money damages for breach of the Lease; and

- order other fees and costs, including interest.

CR.278-79.

Appellants filed their Second Amended Plea to the Jurisdiction on March 22, 2024. CR.353-57. Appellants' Plea to the Jurisdiction was heard

---

[2] Appellee also sued Cecile Erwin Young, in her Official Capacity as Executive Commissioner of HHSC, and Glenn Hegar, Texas Comptroller of Public Accounts. All claims were dismissed against Young and Hegar, and they do not appeal. No cross-appeal has been filed by Appellee.

on December 18, 2024. 3RR.1. The Honorable Judge Laurie Eiserloh, 455th Judicial District Court, Travis County, entered an Order on January 8, 2025, granting in part and denying in part Appellant's plea to the jurisdiction. CR.611. Appellants timely filed their notice of interlocutory appeal on January 23, 2025, pursuant to Texas Rules of Appellate Procedure Rule 4.2. CR.621-25.

## SUMMARY OF THE ARGUMENT

The trial court erred in denying-in-part Appellees' plea to the jurisdiction. First, Chapter 114 of the Texas Civil Practices and Remedies Code does not waive sovereign immunity for the Lessee to the Lease, which is the State of Texas under both the terms of the contract and section 216.055(a) of the Texas Government Code. The Lease is between Appellee and the State of Texas, and the State of Texas is not a "state agency" subject to the chapter. Tex. Civ. Prac. & Rem. Code § 114.001(3). TFC and HHSC are not parties to the lease. CR.282. Therefore, there is no express waiver of immunity.

Second, Chapter 114 does not waive sovereign immunity because the breach of lease claim does not fall under the limited waiver of sovereign immunity. The lease is not a contract for goods or services, specifically engineering, architectural, or construction services under Chapter 114. Appellee only seeks recovery of rent. The alleged services are indirect and attenuated and not the type of "goods and services," specifically "engineering, architectural, or construction services" contemplated by Chapter 114's waiver of

immunity. *See Byrdson Servs. LLC v. South East Texas Reg. Plan. Comm'n*, 516 S.W.3d 483, 486 (Tex. 2016).

Third, sovereign immunity bars Appellee from seeking an interpretation of a legislative appropriation bill. Texas jurisprudence recognizes that declaratory judgment claims against governmental units are generally limited to declarations as to the constitutionality or invalidity of a statute or ordinance. *Swanson*, 590 S.W.3d at 552; *Tex. Parks & Wildlife*, 354 S.W.3d at 388. Claims asserted against the State and its entities under the UDJA which do not challenge the validity or constitutionality of a statute—either seeking only a declaration of rights under a statute or failing to name a particular statute and challenge its validity—remain barred by sovereign immunity. *See Sefzik*, 355 S.W.3d at 621–22. Moreover, this limited waiver only applies to "the relevant governmental entities,"—not state officials. *Id.* at 622. Here, Appellee's claim for declaratory judgment does not fall within this limited waiver because it does not challenge the constitutionality or validity of any statute, and it is brought against officials acting in their official-capacity. Accordingly, Appellee has not and cannot establish a waiver of sovereign immunity.

Lastly, Appellee has not alleged a cognizable ultra vires claim. While it may be true that in certain circumstances, sovereign immunity may be bypassed when a plaintiff brings a cognizable ultra vires action against an official-capacity defendant, Appellee has not done so here for several reasons. First, Appellee has not alleged and cannot ultimately establish facts

19

demonstrating that Executive Director Novak and Deputy Executive Commissioner Niles acted outside of their legal authority or failed to perform a purely ministerial duty. Second, each of the issues raised by Appellee in its petition relates to the exercise of discretion in how an executive agency manages its budget and allocates and distributes appropriated funds among various objectives. The fact that certain state officials who work for HHSC would act within their authority to determine that the monies allocated by the Legislature in any given biennium are not sufficient to pay for a lease without sacrificing other line-item costs or expenses, does not make out an ultra vires claim. It was not only within their authority to make these determinations, but they were also required to under Texas law, and any argument related to such decision is Appellee's improper attempt to control the State. Beacon Nat'l Ins. Co. v. Montemayor, 86 S.W.3d 260, 267 (Tex. App.—Austin 2002, no pet.) ("Whether [the agency's] interpretation is correct or incorrect cannot be the factor that confers jurisdiction."). The Texas Supreme Court expressly forbids such an attempt. Lastly, to plead a valid ultra vires action, a plaintiff must be seeking only prospective injunctive relief. Here, Appellee is seeking retroactive relief, which is insufficient to overcome immunity. CR.258-60.

The trial court erred in its interpretation and application of the relevant statutes and case law on sovereign immunity, and its decision denying Appellants' plea in part should be reversed.

## STANDARD OF REVIEW

"A plea to the jurisdiction challenges the court's authority to decide a case." *Heckman v. Williamson County*, 369 S.W.3d 137, 149 (Tex. 2012). The plaintiff bears the burden to affirmatively demonstrate the trial court's jurisdiction. *Id.* at 150. "When a plea to the jurisdiction challenges the pleadings, [the court] determine[s] if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Texas Dept. of Parks & Wildlife*, 133 S.W.3d at 226. The court must determine whether it has jurisdiction under the constitution or by statute at the earliest opportunity. *Id.* "If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.* at 227. This Court reviews the trial court's ruling on a plea to the jurisdiction *de novo. Chambers-Liberty Cnts. Navigation Dist.*, 575 S.W.3d at 345.

## ARGUMENT

Sovereign immunity "protects nonconsenting states from being sued in their own courts for federal law claims." *Hoff*, 153 S.W.3d at 48 (citation omitted). "Sovereign immunity is 'inherent' in Texas statehood and 'developed without any legislative or constitutional enactment.'" *Univ. of Incarnate Word*, 602 S.W.3d at 403-04 (quotation omitted). "The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002). Sovereign immunity also

preserves the separation of powers, "protects the public treasury," and "prevent[s] potential disruptions of key government services that could occur when government funds are unexpectedly and substantially diverted by litigation." *Univ. of Incarnate Word*, 602 S.W.3d at 404.

Sovereign immunity deprives a trial court of subject-matter jurisdiction in lawsuits against the state unless the state consents to suit. *Miranda*, 133 S.W.3d at 224. "In a suit against a governmental unit, the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity." *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). Agencies of the State of Texas are sovereign entities and, therefore, immune from suit absent express legislative consent. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694-95 (Tex. 2003). Immunity from suit extends to the officers of sovereign entities. *Id.*

Here, the State of Texas, HHSC, TFC, Executive Director Novak, and Deputy Executive Commissioner Niles enjoy immunity from suit and liability absent express consent to the contrary. Therefore, in order to establish the trial court's jurisdiction, Appellee bears the burden of establishing a waiver or exception to each Appellants' sovereign immunity.

Sovereign immunity can be waived in one of two ways: "(1) Congress validly abrogates it, or (2) the State voluntarily waives it." *University of Texas at El Paso v. Herrera*, 322 S.W.3d 192, 195 (Tex. 2010). A Congressional abrogation of sovereign immunity is only valid "provided Congress (1) unequivocally expresses its intent to do so, and (2) acts 'pursuant to a

constitutional provision granting Congress the power to abrogate.'" *Id.* (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55, 59 (1996)).

Any ambiguity in language should be resolved in favor of retaining immunity for the State of Texas, as well as its agencies and officials. *See W. Tex. Mun. Power Agency v. Republic Power Partners, L.P.*, 428 S.W.3d 299, 305 (Tex. App.—Amarillo 2014, no pet.).

## A. Appellee failed to plead a valid waiver of Appellants' sovereign immunity because no statutory waiver exists under Chapter 114 of the Civil Practices & Remedies Code.

Chapter 114 neither waives sovereign immunity nor entitles Appellee to the relief it seeks. Appellee asserts a claim for "Breach of Lease" against the State of Texas, TFC, and HHSC, which Appellee collectively refers to as "State Lessee Entities." CR.257. But Appellee's breach of lease claim is unquestionably barred by sovereign immunity. *See, e.g., Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007) (sovereign immunity bars breach of contract claims) ("[A]bsent special statutory permission, a party cannot pursue a breach of contract action against the State without first obtaining consent from the Legislature.").

Chapter 114 of the Texas Civil Practice and Remedies Code explicitly "waives immunity" for a "state agency that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this chapter." Tex. Civ. Prac. & Rem. Code §§ 114.001(3), .002, .003. But at the same time, the statute attaches the waiver to "a claim for breach of an

express provision of the contract." *Id.* § 114.003. The immunity waiver is also "subject to [Chapter 114's] terms and conditions." *Id.*

Chapter 114 defines "contract subject to this chapter" as "a written contract stating the essential terms of the agreement for providing goods or services to the state agency that is properly executed on behalf of the state agency." Tex. Civ. Prac. & Rem. Code § 114.001(2). It further defines a "state agency" to mean:

> [A]n agency, department, commission, bureau, board, office, council, court, or other entity that is in any branch of state government and that is created by the constitution or a statute of this state, including a university system or a system of higher education. The term does not include a county, municipality, court of a county or municipality, special purpose district, or other political subdivision of this state.

*Id.* § 114.001(3).

## 1. Chapter 114 does not waive immunity over the State.

The Act waives immunity over "[a] state agency" that is "authorized by statute or the constitution to enter into a contract" *and* "enters into a contract subject to the chapter." Tex. Civ. Prac. & Rem. Code §§ 114.001(3), .002, .003. Before even getting to the question of whether the Lease is a "contract subject to this chapter," this Court must determine whether the specific state Appellees—the State, TFC, and HHSC—are state agencies subject to the waiver.

In this case, Appellee alleges the Lease was "executed by a state agency and on behalf of a state agency," and more specifically that "[TFC] entered

24

into the Broadmoor Lease both on behalf of the State of Texas and on behalf of the HHSC." CR.267, 521. But that inaccurate allegation ignores the reality of *who* the actual LESSEE is: the State of Texas. Only the State is "authorized by statute or the constitution to enter into [this] contract." Tex. Gov't Code § 2167.055(a). The State of Texas is not a "state agency" under the definition of Section 114.001(3), and thus not subject to the waiver of immunity of the Chapter.[3] Similarly, Appellee has no contractual relationship with HHSC or TFC for which to assert a breach of contract claim, because the Lease is specifically with the State of Texas (the only state entity legally capable of entering into a lease). Accordingly, there is no waiver of sovereign immunity over the State, HHSC, or TFC for Appellee's Chapter 114 claims.

The Lease states that the parties to the lease are:

> LESSOR, BROADMOOR AUSTIN ASSOCIATES, A JOINT VENTURE and LESSEE, STATE OF TEXAS, acting by and through the Texas Facilities Commission (TFC).

CR.282. Similarly, Chapter 2167 of the Texas Government Code governs "Lease of Space for State Agencies." Tex. Gov't Code §§ 2167.001 *et seq.*; *see also* CR.275-76. Section 2167.055 explicitly states that in a contract for the commission of a lease of space, it is the State that is the lessee. Tex. Gov't

---

[3] To the extent the Lease is inconsistent in its usage of how it uses the terms Lessee and "State of Texas," it does not transform the fact that the Lease is plainly between Appellee and the State of Texas, regardless of the entity that may inure a benefit, that only the State of Texas can enter into a lease, and the State of Texas is not a "state agency" under the plain meaning of Chapter 114.001(3).

Code § 2167.055(a). The State acts "by and through" TFC. *Id.* And that lease contract is contingent on the availability of money appropriated by the Legislature to pay for the lease. Tex. Gov't Code § 2167.055(e). In this case, the State of Texas entered into the Lease, through TFC, "for and on behalf of the occupying agency, HHSC" as stated in the Lease Term Amendment and the Lease Extension Amendment. CR.291, 307.

Chapter 114 applies "*only* to a claim for breach of a written contract for engineering, architectural, or construction services or for materials related to engineering, architectural, or construction services brought by a party to the written contract, in which the amount in controversy is not less than $250,000[.]" Tex. Civ. Prac. & Rem. Code § 114.002 (emphasis added). Chapter 114 defines "contract subject to this chapter" as "a written contract stating the essential terms of the agreement for providing goods or services to the state agency that is properly executed on behalf of the state agency." Tex. Civ. Prac. & Rem. Code § 114.001(2). It further defines a "state agency" to mean:

> an agency, department, commission, bureau, board, office, council, court, or other entity that is in any branch of state government and that is created by the constitution or a statute of this state, including a university system or a system of higher education. The term does not include a county, municipality, court of a county or municipality, special purpose district, or other political subdivision of this state.

*Id.* § 114.001(3). The chapter explicitly "waives immunity" for a "state agency that is authorized by statute or the constitution to enter into a contract and

26

that enters into a contract subject to this chapter" for the "purpose of adjudicating a claim for breach of an express provision of the contract, subject to the terms and conditions of this chapter." § 114.003. Thus, sovereign immunity is waived only when a state agency enters into a written contract wherein the essential terms are to provide goods or services in the context of engineering, architectural or construction services or for materials related thereto in an amount not less than $250,000.

As the Lease clearly provides, the only entities entering into the contract are Appellee and the State of Texas. The State itself is certainly not a "state agency" subject to this chapter. If the Legislature intended for the State to be included in Chapter 114, it would have either stated that intention expressly or incorporated it in the definition of state agencies. [4] The State and its entities are sovereign for purposes of immunity. Because the State is not a state agency, as contemplated by Chapter 114, it is not subject to Chapter

---

[4] The Texas Supreme Court has found a "reliable guidepost to determine if the Legislature intended to waive immunity when its intent is less clear." *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 701 (Tex. 2003), judgment withdrawn and reissued (May 13, 2003). In particular, the Court noted that in many statutes waiving sovereign immunity explicitly, the Legislature "appends a measure designed to protect the public treasury from the consequence of that waiver." *Id.* at 701, n.9. The Court's decisions recognizing a waiver of immunity "have generally left undisturbed the Legislature's interest in protecting the State's financial resources." *Id.* at 701. Accordingly, the Legislature has an interest in *not* including the State in the limited waiver of sovereign immunity in Chapter 114 over breach of lease claims.

114. Accordingly, there is no express Legislative waiver of immunity over the State of Texas and this claim must be dismissed against the State.[5]

## 2. Chapter 114 does not waive immunity over HHSC or TFC.

There is no waiver of sovereign immunity over HHSC and TFC because they are not parties to the Lease and, therefore, there is no basis for bringing a breach of lease claim under Chapter 114. As stated above, Chapter 114 only waives immunity for a "state agency that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this chapter," and neither TFC (as the agent) nor HHSC (as the occupying agency) has a contract with Appellee. CR.282. Further, according to Texas Government Code § 2167.055(a), a state agency is not authorized to enter into a contract for the lease of space—only the State of Texas is authorized to enter into a contract as the lessee. Because Appellee has no contractual relationship with HHSC or TFC for which to assert a breach of claim, Appellee cannot assert a claim under Chapter 114 against HHSC or TFC and there is no waiver of immunity.

## 3. Appellee's claim is not within the scope of the limited waiver of sovereign immunity in Chapter 114.

Here, there is not only a question of whether a clear and unambiguous immunity waiver exists against the State, HHSC, and TFC (it does not), but

---

[5] Section 7(l) of the Lease itself states: "No provision, covenant or agreement contained in this Lease shall be deemed a waiver of sovereign immunity of the State of Texas from tort or other liability." CR.286.

also whether Appellee's breach of lease allegations and damages fall within the scope of the express statutory waiver of Chapter 114 (they do not).

Appellee alleges that the Lease in question is a contract for construction services that falls within the scope of the waiver of Section 114.002. CR.523. Even if the Lease met the requirements of section 114.003, it cannot meet the requirements of section 114.001(2). Section 114.001(2) defines "contract subject to this chapter" as a "written contract . . . for providing goods or services to the state agency that is properly executed on behalf of the state agency." Tex. Civ. Prac. & Rem. Code § 114.001(2).

Appellee seeks "a judgment against the State Lessee for the monetary damages [Appellee] has incurred that were proximately caused by its unexcused breach of the [Appellee] Lease" (i.e., recovery of rent from a lease). *See* CR.279. A lease for square footage in an office building is not a contract "for providing goods or services" within the meaning of Chapter 114. Any alleged "services" at issue here, such as ensuring off-street parking is available and maintaining the building so that it remains inhabitable, are indirect and attenuated, at best, and are not the type of "goods and services" contemplated by Chapter 114's waiver of immunity. *Cf. Byrdson*, 516 S.W.3d at 486 (acknowledging that a contract covered by the immunity waiver in Chapter 271 applicable to a local governmental entity must provide more than an indirect benefit to the governmental entity to waive immunity). Further, although the courts generally construe the provision of goods and services broadly, "waiver will typically apply only to contracts in which the governmental

entity agrees to pay the claimant for the goods and services that the claimant agrees to provide to the governmental entity." *Lubbock Cnty. Water Control & Imp. Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 304–05 (Tex. 2014). Where the lease agreement contains no terms in which the governmental entity agrees to pay the lessor for its "services," there is no amount due and owed under the contract, as is the case here. *See id.*

Similarly, the plain text of Section 114.002 further limits any waiver of immunity, as a claim must (i) fall within the limited categories of contracts ("engineering, architectural or construction services"), (ii) be "brought by a party to the written contract," (iii) be in excess of $250,000, and (iv) relate to a "breach of an express provision of the contract." Tex. Civ. Prac. & Rem. Code §§ 114.002-.003. Specifically, Chapter 114 states that it "applies only to a claim for breach of a written contract for engineering, architectural, or construction services or for materials related to engineering, architectural, or construction services brought by a party to the written contract[.]" *Id.* § 114.002. In this case, the contract is for a rental agreement for 122,123 square feet of office space, not engineering, architectural, construction services. *See* CR.275. The purpose of the Lease is to lease the specified space; to the extent HHSC or TFC could be found to be "parties" to the contract (they are not), Appellee has not identified an express provision that was breached that would fall within the limited categories (engineering, architectural,

30

construction services) and be in excess of $250,000.[6] Appellee's claim is simply not within the limited waiver of sovereign immunity in Chapter 114.

In fact, Appellee cannot identify an express provision that was breached because the Lease explicitly permits early termination of the lease. The authority that governs payment of rent under the Lease explains who pays Monthly Rent under the lease:

> MONTHLY RENTAL
>
> The Lessee agrees to pay Lessor a base Monthly Rent during the term of this lease in accordance with the Rent Schedule as detailed in Exhibit A. The rental payments provided herein shall be due and payable by Lessee in advance on the first day of the month for which said rentals are due.
>
> This lease contract is made and entered into in accordance with and subject to the provisions of the Texas Constitution and the Texas Government Code, Title 10, Subtitle D, and is made contingent upon the continuation of the availability of money appropriated by the legislature to pay for the lease.

CR.283. The lease goes on to state that the Executive Branch of the State of Texas can cease to fund the lease at any time in its discretion:

> In the event the Legislature *or the Executive Branch of the State of Texas* cease to fund the lease, . . . the Commission, upon written notice to the Lessor, either may terminate this lease, or sublet in whole or in part to a private third party.

---

[6] Unlike Chapter 271 of the Texas Local Government Code, which waives immunity for breach of contract upon execution of a contract, Chapter 114 governs adjudication of claims for "breach of an express provision of the contract." Tex. Civ. Prac. & Rem. Code § 114.003. Strict application of the plain language of the statute is necessary, or else it becomes meaningless. Therefore, it is insufficient to merely allege breach of contract; a plaintiff must point to an express provision that was allegedly breached.

*Id.* The Executive Branch is headed by the Governor of the Texas and includes numerous state agencies, including HHSC. Tex. Gov't Code Chapter, Title 4, Subtitle I. Because this provision is clear that the State of Texas or the executive agency may cease funding the lease, there is no explicit provision that Appellee can point to that has been breached. The State of Texas, HHSC, and TFC have not consented to suit, and the Legislature has not waived their immunity. Thus, the district court erred in deny Appellants' plea to the jurisdiction over Appellee's breach of lease claim.

### 4. Chapter 271 of the Texas Local Government Code does not apply.

Chapter 271 of the Texas Local Government code neither waives immunity over or applies to the State and its agencies.

Chapter 271 specifically waives immunity from contract suits *for local governmental entities*. Tex. Loc. Gov't Code 271.152. Section 271.152 of the Act states:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into *a contract subject to this subchapter* waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, *subject to the terms and conditions of this subchapter*.

*Id.* (emphasis added). A "contract subject to this subchapter" includes "a written contract stating the essential terms of the agreement for providing goods or services *to the local governmental entity* that is properly executed *on behalf of the local governmental entity.*" *Id.* § 271.151(2)(A) (emphasis added).

32

Appellant claims that because the "relevant portions of the two statutes are essentially identical," Texas caselaw interpreting Chapter 271 (in the local government context) is instructive when applying the provisions of Chapter 114 (in the state agency context). CR.526-27. However, when it comes to an issue of waiver, cardinal rules of statutory construction demonstrate there is no need to "contextualize" the plain terms of Chapter 114 by looking to a completely different Act such as Chapter 271. Nevertheless, Appellee relies on the *Hoppenstein* case out of the Waco Court of Appeals, to argue that the design and construction services provided in this Lease should waive the State's immunity for breach of the Lease under Chapter 114. CR.527-28 (citing *Hoppenstein Props., Inc. v. McLennan Cnty. Appraisal Dist.*, 341 S.W.3d 16, 20 (Tex. App.—Waco 2010, pet. denied).[7]

In *Hoppenstein,* the appraisal district contracted with Hoppenstein in a specific construction addendum to renovate the premises, and the court found the lease therefore entailed provisions of services within the meaning of Chapter 271. *Hoppenstein* is not binding authority on this Court, and it also did not interpret and is not applicable to the language and requirements of Chapter 114 related to state entities. Sections 114.002 and .003 require the breach of an "express provision of the contract" relating to "engineering,

---

[7] Notably, there are no cases to support Appellee's claims because the clear language of Chapter 114 is limited to state agencies entering contracts for goods and services and are not applicable to leases for real property which are similarly limited in that only the State of Texas may enter into such a lease. Tex. Gov't Code § 2167.055(a).

architectural, or construction services" or materials used therein. Tex. Civ. Prac. & Rem. Code § 114.002, .003. Appellee argues that the Lease in this case is for construction services based on some design and service obligations. CR.528, n.5. But that does not transform a contract for rent/lease into a contract for construction. And Appellee cannot show that Appellants failed to pay the benefit of the bargain for any construction or services rendered under the Lease at any specific time before termination. The only specific provisions of the contract alleged to be breached are current rental payments due, not related to previous design or service obligations. Therefore, the Lease does not fall under the limited waiver of immunity under Chapter 114.

**B. The trial court has no jurisdiction to consider Appellee's declaratory judgment claim because it does not fall within the scope of the waiver provided by the UDJA.**

To the extent Appellee argues that the UDJA waives sovereign immunity, such argument fails. *See* CR.274. In enacting the UDJA, sovereign immunity was only waived for claims challenging the validity or constitutionality of a statute or ordinance. *See, e.g., City of Dallas v. Sabine River Auth. of Tex.*, 03-15-00371-CV, 2017 WL 2536882, at *4 (Tex. App.—Austin June 7, 2017, no pet.)(mem. op.); *see also* Tex. Civ. Prac. & Rem. Code § 37.006(b). This narrow waiver does not extend to claims seeking a declaration of rights. *See, e.g., Tex. Parks & Wildlife Dep't*, 354 S.W.3d at 388; *Sefzik*, 355 S.W.3d at 621–22. "The UDJA does not create or augment a trial court's subject-matter jurisdiction—it merely provides a remedy where subject-matter jurisdiction already exists." *Texas Logos, L.P. v. Texas Dep't of Transp.*, 241

S.W.3d 105, 114 (Tex. App.—Austin 2007, no pet.) (citing Tex. Civ. Prac. & Rem. Code § 37.003(a)).

> **1. Appellee's declaratory judgment claim is barred by sovereign immunity because it does not challenge the validity or constitutionality of a statute.**

Here, Appellee seeks a declaratory judgment that the 88th Texas Legislature appropriated funds to pay rent to Appellee to satisfy the State' obligations under the Lease for the 2024 and 2025 fiscal years. CR.274. This claim does not fall within the scope of the waiver of sovereign immunity for UDJA claims against the State and its entities, because it does not include a challenge to the validity or constitutionality of a statute.

The Texas Supreme Court has explained that sovereign immunity does not bar suits against the State challenging the constitutionality of a statute and seeking only equitable relief. *See Patel v. Tex. Dep't of Licensing and Regulation*, 469 S.W.3d 69, 75–76 (Tex. 2015); *see also City of El Paso*, 284 S.W.3d at 372–73, n.6 (holding that the UDJA waives sovereign immunity for claims challenging the validity of statutes). Conversely, claims asserted against the State under the UDJA which do not challenge the validity or constitutionality of a statute—either seeking only a declaration of rights under a statute or failing to name a particular statute and challenge its validity—remain barred by sovereign immunity. *See Sefzik*, 355 S.W.3d at 621–22.

Here, Appellee does not challenge the constitutionality or validity of any statute, but instead only seeks a declaration that the 88th Texas Legislature appropriated funds to pay rent to Appellee. As such, there is no waiver of

immunity, and the trial court erred by denying Appellants' request to dismiss this claim for want of jurisdiction.

### 2. Appellee has not pled a declaratory judgment action that would resolve the judicial controversy.

The trial court is also without jurisdiction of Appellee's UDJA claim because the requested declaratory judgment would not resolve the underlying controversy.

A declaratory judgment requires a judicial controversy as to the rights and status of parties actually before the court for adjudication, and the declaration sought must actually resolve the controversy." *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163–64 (Tex. 2004). Otherwise, the judgment amounts to nothing more than an advisory opinion, which a court does not have the power to give. *Lone Starr Multi Theatres, Inc. v. State*, 922 S.W.2d 295, 297 (Tex. App.—Austin, 1996, no writ.) (citation omitted).

Furthermore, permitting a declaration that seeks to resolve issues already raised by a claim, such as Appellee's breach of lease claim, is an improper exercise of discretion. Texas courts have consistently rejected declaratory judgment claims that seek the resolution of matters that will already be resolved as part of the claims in the lawsuit. *See, e.g., Narisi v. Legend Diversified Investments*, 715 S.W.2d 49, 51 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) ("[T]he legislature did not intend to authorize defendants to bring a declaratory judgment action to determine rights already subject to determination in a pending suit.").

It is well-settled that the UDJA does not in and of itself provide subject-matter jurisdiction. *Chenault v. Phillips*, 914 S.W.2d 140, 141 (Tex. 1996) (holding UDJA is only a procedural device for deciding matters already within a court's subject matter jurisdiction). Thus, other than as specifically allowed, the UDJA does not allow parties to circumvent the State's sovereign immunity by re-characterizing a barred suit as one that is not. *See Sefzik*, 355 S.W.3d at 621–22. Thus, immunity will bar even an otherwise proper declaratory relief suit that has the effect of establishing a right to relief against the State or its political subdivisions for which the Legislature has not waived immunity. *See id.* at 622.

Appellee cannot maintain a cause of action for declaratory relief to establish factual elements of a breach of contract claim that is barred by sovereign immunity. Sovereign immunity bars a breach of contract claim and private parties cannot circumvent the State's sovereign immunity from suit by characterizing a contract dispute as a declaratory judgment claim. *Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 597 (Tex. 2001). Here, Appellee's declaratory judgment action asks the Court to declare that the 88th Texas Legislature appropriated funds to pay rent to Appellee to satisfy the States's alleged obligations under the Lease for the 2024 and 2025 fiscal years. CR.274. This is merely one issue of Appellee's breach of lease claim and, as a result, does not resolve the immediate controversy between the parties.

In fact, even if this Court issued an order with this declaration, the Court's judgment would not offer Appellee any type of redress or affect the

legal relationship of the parties, as the issue of the contractual obligations of the parties, among other issues, still remains part of its barred breach of lease claim. As a result, Appellee's request for a declaration would require this Court to issue an improper advisory opinion. Section 37.008 of the UDJA contemplates such situations, providing:

> The court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding.

Tex. Civ. Prac. & Rem. Code § 37.008. However, the Court need not rely on Section 37.008 because Appellee's request for declaratory relief against Appellants is barred by sovereign immunity. Accordingly, the claim must be dismissed for want of jurisdiction.

3. **Appellee has not pled a valid declaratory judgment action against Executive Director Novak and Deputy Executive Commissioner Niles.**

The trial court is also without jurisdiction to reach the claim as to Executive Director Novak and Deputy Executive Commissioner Niles because such a claim may only be brought against the agency itself, not a state official, and the Legislature has not waived sovereign immunity for all actions against the State that might fall within its scope, but only those claims against the sovereign entity itself. *Sefzik*, 355 S.W.3d at 621, 622, n.3. Because Appellee's UDJA claim is brought against all Appellees, not just the entities themselves, sovereign immunity is not waived as to the UDJA claim against Executive Director Novak and Deputy Executive Commissioner Niles.

## C. Appellee cannot establish jurisdiction over its *ultra vires* claim.

While Appellee's breach of lease and UDJA claims do not fall within the limited and narrow waiver contemplated by Chapter 114 of the Civil Practices & Remedies Code and the UDJA, Appellee argues that the *ultra vires* exception to sovereign immunity nonetheless applies to Executive Director Novak and Deputy Executive Commissioner Niles for actions related to the termination of the Lease. CR.275-77. This exception to sovereign immunity applies to claims that a governmental official acted without lawful authority or failed to perform a purely ministerial act. The Supreme Court has articulated that "[n]otwithstanding sovereign immunity, Texas law recognizes 'ultra vires' claims seeking prospective injunctive relief against individual government officials in their official capacities." *Heinrich*, 284 S.W.3d at 373, 376.

### 1. Appellee has not pled facts establishing Executive Director Novak and Deputy Executive Commissioner Niles acted beyond the scope of their authority.

*Ultra vires* claims are a rare exception to a state's immunity. "To fall within this ultra vires exception, a suit . . . must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* at 372. If the plaintiff has not actually alleged such an action, the claims remain jurisdictionally barred. *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011) ("[Defendant official] retains immunity from suit unless the [plaintiffs] have pleaded a viable claim."). "While it is true that sovereign immunity does not bar a suit to vindicate constitutional rights, immunity from suit is not waived if the constitutional claims are facially

invalid." *Klumb*, 458 S.W.3d at 13 (internal citations omitted). Alternativity said, where an official-capacity defendant acts within his legal authority, he is entitled to sovereign immunity. *See Hall v. McRaven*, 508 S.W.3d 232, 240–41 (Tex. 2017). Under this standard, Appellee has not pled a viable claim.

Chapter 2167 of the Texas Government Code governs "Lease of Space for State Agencies." Tex. Gov't Code 2167.001 *et seq*. Section 2167.055(e) states that "a lease contract is contingent on the availability of money appropriated by the legislature to pay for the lease." Section 2167.101 further states that a "state agency occupying space leased under this chapter shall certify to the commission . . . that money is available to pay for the lease until the end of the next fiscal biennium." Tex. Gov't Code 2167.101.

Appellee alleges that Deputy Executive Commissioner Niles "wrongfully failed to certify" to TFC that funds were in fact available to fund the Lease. CR.276. Appellee further seeks an injunction mandating Executive Director Novak comply with his alleged "non-discretionary statutory obligations to instruct that rent be paid under the Lease for the 2024-2025 fiscal years." CR.277. Appellee also alleges Executive Director Novak did not comply with TFC's own rules for terminating a lease. CR.277.

These allegations are insufficient to establish the Court's subject matter jurisdiction because "merely asserting legal conclusions or labeling a defendant's actions as 'ultra vires,' 'illegal,' or 'unconstitutional' does not suffice to plead an ultra vires claim—what matters is whether the *facts* alleged

constitute actions beyond the governmental actor's statutory authority, properly construed." *Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 702 (Tex. App.—Austin 2011, no pet.) (emphasis in original); *Tabrizi v. City Austin*, 551 S.W.3d 290, 305 (Tex. App.—El Paso 2018, no pet.) (holding the that the trial court lacked subject-matter jurisdiction because the pleaded facts did not allege viable *ultra vires* claim).

"Ultra vires claims depend on the scope of a state official's authority." *Hall*, 508 S.W.3d at 234. As such and contrary to Appellee's belief, the natural starting point in this case is HHSC's governing authority. *See contra*, CR.276, 277 (seeking an injunction mandating Deputy Executive Commissioner Niles comply with his "non-discretionary statutory obligations to certify the availability of funds" and seeking an injunction mandating Executive Director Novak retract the alleged wrongful termination of the Lease and comply with his "non-discretionary statutory obligations to instruct that rend by paid" under the Lease").

Neither section of Chapter 2167 explains when, whether, or how that money is determined to be "available" "to pay for the lease" with such "precision and certainty as to leave nothing to the exercise of discretion or judgment." *City of Houston v. Houston Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 576 (Tex. 2018). Appellee has not pled that Deputy Executive Commissioner Niles made the decision that funds were unavailable to pay the rent under the Lease for the 2024-25 fiscal years. But once HHSC determined that funds were unavailable to pay rent under the Lease, Deputy Executive

Commissioner Niles was obligated to certify that the funds were not available. Tex. Gov't Code § 2167.101. To the extent Appellee implies that Deputy Executive Commissioner Niles's actions impute the funding determination to an action he made, Appellee has not and cannot allege that the determination of the "availability" or "lack of funding" available to pay for the lease is non-discretionary and thus falling under the *ultra vires* exception to Deputy Executive Commissioner Niles's sovereign immunity.

Further, Executive Director Novak simply carried out the actions within his authority to complete the action—terminating the Lease[8]—after HHSC made the determination. Appellee makes no allegation that Executive Director Novak was involved in the decision that funds were not appropriated for this Lease. If funds were not appropriated pursuant to section 2167.101, TFC could terminate the Lease. But even so, TFC has an obligation and the discretion—required by the Legislature—through section 2167.0021, to make leasing decisions on the basis of obtaining best value for the state. Tex. Gov't Code § 2167.0021. Simply pleading that the action is "non-discretionary" does not make it so. *Texas Dep't of Transp.*, 357 S.W.3d at 702. Executive Director Novak was acting within his discretion when he provided the termination notice for the Lease, and his interpretation cannot be made the basis

---

[8] Despite arguing Executive Director Novak failed to follow TFC rules, Appellee cannot reasonably argue that the provision of the Lease, which makes the Lease contingent upon the continuation of availability of money appropriated by the Legislature to pay the lease, did not put Appellee on notice at least six-months prior to the termination of the Lease. CR.283.

of an *ultra vires* action. To hold otherwise would thwart the Legislature's goal in enacting section 2167.0021.

## 2. Appellee has not established that Executive Director Novak or Deputy Executive Director Niles acted outside their legal authority.

"An ultra vires claim based on actions taken 'without legal authority' has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority." *Hall*, 508 S.W.3d at 239. A government officer acts without legal authority if he exceeds the bounds of his granted authority or if his acts conflict with the law itself. *Houston Belt & Terminal Railway Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). In such cases then, *"ultra vires* claims depend on the scope of the state official's authority." *Hall*, 508 S.W.3d at 234. Consequently, the standard for an *ultra vires* act is whether it was done without legal authority, not whether it was correct. *Id.* Likewise, it is *not* an *ultra vires* act for a government official to make a decision or to act within his or her authority in a manner that differs from the way others might have acted with similar authority.

When such absolute discretion—free decision-making without any constraints—is granted, *ultra vires* suits are absolutely barred. However, as a general rule, "a public officer has no discretion or authority to misinterpret the law." *Cf. In re Smith,* 333 S.W.3d 582, 585 (Tex. 2011) (orig. proceeding).

The question is thus whether Executive Director Novak and Deputy Executive Commissioner Niles had the discretion to take the actions taken,

43

including whether HHSC officials had the discretion to determine how to spend the general "lease" funds appropriated by the Legislature. Appellee alleges no facts that any individual at HHSC violated any law or was restricted from making a determination that the funds it requested and received from the Legislature's Appropriation Bill are or are not sufficient to cover any particular state agency line item. In fact, Appellee's petition does not challenge HHSC's discretion to determine whether funds are appropriated—it only challenges the agency's interpretation of the appropriation bill and actions based on that determination. CR.275-77.

Each of the alleged *ultra vires* actions depend on a determination by HHSC on how to balance its budget and allocate the funds it received from the Legislature. For example, the only alleged action taken by Deputy Executive Commissioner Niles is that he had to certify to TFC if funds were available. *See* Tex. Gov't Code §523.0051; *see also* § 2167.101. Once a determination was made by HHSC that, in its discretion, funds were not available, a fact that Appellee does not allege as violating any particular law, then Deputy Executive Commissioner Niles was required to act within his authority and certify saying as much. *Id.* Similarly, Executive Director Novak was authorized to send a notice of termination of the Lease upon HHSC's determination that the Legislature had failed to fund it. *Id.*

Appellee argues that it is "nonsensical to read Section 2167.101 to allow a state agency to cause a lease termination by simply failing to truthfully report on the funds that have been made available to the agency to pay for a

lease." CR.536. But Appellee ignores that the Legislature has given agencies discretion to effectively manage their budgets and allocate appropriations. Appellee's Lease is not a line item on the General Appropriations Act for which the Legislature specifically allocates funding; instead, the Legislature provides set funds for a specific program or general funding need (like leases, generally) and HHSC is granted the discretion to determine the best use of those funds within the allotted program or funding area. *See* CR.13 (citing HB 1 showing HHSC amounts appropriated for "Rent – Building"). Every alleged *ultra vires* action alleged by Appellee depends on the fundamental discretion of HHSC (as well as other state agencies) to make this determination. Appellee has not alleged any cause of action challenging that determination as violating the law. And as to Appellee's argument that the actions of Executive Director Novak and Deputy Executive Commissioner Niles are only entitled to "limited" discretion, the Texas Supreme Court has continued to hold that merely alleging an official's discretion is limited will not be sufficient to avoid dismissal. As the Court noted in *Houston Belt & Terminal Railway Co. v. City of Houston*, "many legislative grants of authority, although not absolute, will be broad enough to bar most, if not all, allegedly *ultra vires* claims." 487 S.W.3d at 158.

Each of these alleged *ultra vires* actions stem from an action by HHSC to determine whether the Legislature appropriated funds to pay the particular Lease, a determination that HHSC has discretion over.

### 3. Appellee has failed to establish that Executive Director Novak and Deputy Executive Commissioner Niles failed to perform a purely ministerial act.

An *ultra vires* claim can also stem from a state official's failure to perform a purely ministerial act. *Heinrich*, 284 S.W.3d at 372. "Ministerial acts are those where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *City of Houston*, 549 S.W.3d at 576 (quotation omitted). "Conversely, discretionary acts are those that require the exercise of judgment and personal deliberation." *Id.* "A writ of mandamus can be used to compel a public official to perform a 'ministerial act,' which, for purposes of mandamus, is an act where 'the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion.'" *Id.* at 577 (quotation omitted).

Moreover, an allegation that a state officer made an administrative agency decision that is erroneous, or an incorrect interpretation of law is not an allegation of an action or "conduct" that exceeds the bounds of one's authority; it therefore cannot form the basis of an *ultra vires* claim. *See City of Austin v. Utility Assocs., Inc.*, 517 S.W.3d 300, 310 (Tex. App.—Austin 2017, pet. denied) ("Where, as here, a governmental body has been delegated authority to make some sort of decision or determination, immunity jurisprudence has long emphasized a critical distinction between alleged acts of that body that are truly ultra vires of its decision-maker authority, and are therefore not shielded by immunity, and complaints that the body merely 'got it

46

wrong' while acting within this authority, which are shielded."); *Tex. Comm'n of Licensing & Regulation v. Model Search Am., Inc.*, 953 S.W.2d 289, 292 (Tex. App.—Austin 1997, no writ) (explaining that claiming an agency had authority to interpret statute but had interpreted provision incorrectly was insufficient to invoke *ultra vires* exception because the possibility that the agency might interpret the provision incorrectly did not destroy its authority to make that determination).

The Texas Supreme Court has held that a cognizable *ultra vires* claim must challenge the government official's authority to decide, not the correctness of the official's decision. *Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54, 68 (Tex. 2018). For example, in *Harlan v. Tex. Department of Insurance*, a plaintiff alleged that a worker's compensation administrative hearing officer acted *ultra vires*. No. 01-14-00479-CV, 2016 WL 3476914, at *2–*3 (Tex. App.—Houston [1st Dist.] June 23, 2016, no pet.)(mem. op.). But because a hearing officer's functions are discretionary, and the hearing officer acted within the bounds of that discretion in that she issued an administrative decision with which the plaintiff merely disagreed; she enjoyed immunity. *Id.* at *3

The very nature of the budgetary process requires HHSC and personnel to exercise discretion in determining whether sufficient funds were appropriated to pay various expenses. Essentially, Appellee implies but fails to plead that there is a person or persons at HHSC that made an incorrect determination that breached the lease. But once that determination was made,

Deputy Executive Commissioner Niles completed the ministerial duty to certify funds were not available, which he did, and which resulted in Executive Director Novak terminating the lease. CR.316-318, CR.320. Appellee points to no facts to demonstrate that Deputy Executive Commissioner Niles thought or understood his statement in the certification to be false. Appellee may not agree with the decision the agency made, but the agency has the responsibility to determine whether the funds requested will cover existing costs given the best value to the state. Tex. Gov't Code 2167.0021.

Appellee's claim is an attempt to control state action. Agencies are delegated authority to determine their budgets. Here, Appellee attempts to handcuff HHSC—and all similarly situated state agencies—from effectively determining whether the Legislature has appropriated funds sufficient to support their requested appropriations. By asking this Court to instruct HHSC how to prepare its budget or interpret the appropriations bill to support the budget of the agency, Appellee is not asserting a valid *ultra vires* claim. It is instead seeking to control state action by restraining the state and its officials in the exercise of discretionary statutory or constitutional authority—which is barred by sovereign immunity. *See Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 198 (Tex. 2004).

### 4. Appellee improperly seeks retrospective relief, which is outside the scope of the *ultra vires* exception.

A threshold question one must ask is whether the plaintiff's relationship to the governmental entity is ongoing, or whether it has terminated. As the

Fourteenth Court of Appeals articulated in its *City of Galveston v. CDM Smith, Inc.* decision, if the suit arises out of a contract or other arrangement that has ended before the suit is filed, any relief would be, by definition, retrospective and an *ultra vires* suit cannot be maintained.

In *CDM Smith*, a contractor assisting with reconstruction after Hurricane Ike sued the City after it stopped submitting the contractor's invoices for payment by the U.S. Department of Housing and Urban Development. 470 S.W.3d 558, 562–63 (Tex. App.—Houston [14th Dist] 2015, pet. denied). The contractor sued city officials, alleging that they acted *ultra vires* in failing to invoice HUD on its behalf. The Fourteenth Court, however, rejected the contractor's purported ultra vires claim because it sought retrospective relief. *See id.* at 569–570. "As Heinrich made clear, immunity for an ultra vires act is only a waiver with regard to bringing future acts into compliance with the law." *Id.* at 569. In *CDM Smith*, however, the allegedly *ultra vires* acts—refusing to approve and submit the invoices to HUD—had already occurred and were not recurring because the contract had already expired. *Id.* at 570. Hence, there was no possible prospective relief that could be attained in an *ultra vires* suit. Since *Heinrich*, the scope of the *ultra vires* exception to immunity has been both expanded and narrowed—in the context of real property disputes and (allegedly) unconstitutional regulations, respectively. In all cases, however, "[t]o fall within this ultra vires exception, a suit must not complain of a government officer's exercise of discretion." *Heinrich*, 284 S.W.3d at 372.

Accordingly, Appellee is asserting *ultra vires* claims against Executive Director Novak and Deputy Executive Commissioner Niles for their prior actions, which is by its very nature retrospective relief which does not meet the requirements to be a valid *ultra vires* suit. Therefore, sovereign immunity bars the suit against Novak and Niles from going forward.

Retrospective monetary relief is also generally barred for *ultra vires* claims. Relying on the *Hartzell* case, Appellee argues that it only seeks prospective injunctive remedies. CR.540-41 (citing *Hartzell* v. S.O., 672 S.W.3d 304, 311 (Tex. 2023)). But the injury that Appellee complains of is the termination of the Lease. CR.275-76. And a quick glance at Appellee's Prayer for Relief in its Second Amended Petition only shows a request for a judgment against the State and its entities for "monetary damages" and other monetary relief for the alleged breach. CR.279. Any further "injunctive" relief as a result of Appellee's alleged *ultra vires* claims would necessarily require the Court to "undue" past decisions, such as the termination of the Lease and certification of funds. CR.278. Therefore, it is clear that Appellee's request for "injunctive relief" is merely a disguised claim for compensation for past harm.

If this Court were to order Appellants to take the actions requested (and ultimately reinstate the Lease), this Court would in effect be ordering Appellants to pay Appellee compensation for past conduct. Such retrospective monetary relief is barred.

## CONCLUSION

For these reasons, Appellants respectfully request that this Court reverse the partial denial of their Plea to the Jurisdiction and remand to the trial court with instruction to dismiss with prejudice Appellee's claim.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

*/s/ Alyssa Bixby-Lawson*

ALYSSA BIXBY-LAWSON
Attorney-in-Charge
Texas Bar No. 24122680
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(210) 270-1118 | FAX: (512) 320-0667
Alyssa.Bixby-Lawson@oag.texas.gov

*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 17th day of March, 2025, the foregoing *Brief of Appellants* was filed with the Clerk of this Court and served on the following via EFileTexas.gov efiling service.

Jason R. LaFond
Sara Clark
Casey Dobson
Scott Douglass & McConnico LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300
Phone (512) 495-6399 Fax
jlafond@scottdoug.com
sclark@scottdoug.com
cdobson@scottdoug.com

***Counsel for Appellee***

*/s/ Alyssa Bixby-Lawson*
Alyssa Bixby-Lawson
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this Appellant's Brief contains 10,971 words, excluding the portions of the brief exempted by Rule 9.4(i)(1), as calculated by Microsoft Office 360.

_/s/ Alyssa Bixby-Lawson_
ALYSSA BIXBY-LAWSON
Assistant Attorney General

# APPENDIX

Appendix A    Order Granting in Part and Denying in Part
Defendants' Amended Plea to the Jurisdiction to
Second Amended Petition

Appendix B    State Lease Between Broadmoor Austin
Associates, a Texas Venture, and State of Texas

Appendix C    Civil Practice and Remedies Code, Title 5,
Chapter 114

CAUSE NO. D-1-GN-23-007899

| | | |
|---|---|---|
| BROADMOOR AUSTIN ASSOCIATES, a Texas Joint Venture, | § § § | In the District Court of |
| *Plaintiff,* | § § | |
| v. | § § | Travis County, Texas |
| THE STATE OF TEXAS, acting by and through the Texas Facilities Commission, for and on behalf of the Texas Health and Human Services Commission; *et al.* | § § § § § § | |
| *Defendants* | § § | 455th Judicial District |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' AMENDED PLEA TO THE JURISDICTION TO SECOND AMENDED PETITION

On this day, the Court considered Defendants' Amended Plea to the Jurisdiction to Second Amended Petition (the "Plea"). After considering the Plea, Plaintiff's Response, Defendants' Reply, the evidence presented, and the arguments of counsel, the Court finds that the Plea should be and hereby is GRANTED as to: (i) Defendant CECILE ERWIN YOUNG in her Official Capacity as Executive Commissioner of the Texas Health and Human Services Commission, and (ii) GLENN HEGAR, Texas Comptroller of Public Accounts. In all other respects, the Plea should be and hereby is DENIED.

Signed ~~this~~ ~~day of~~ January 8 , 2025.

_Laurie Eiserloh_
Honorable Laurie Eiserloh

AGREED AS TO FORM:

_Sara W. Clark_
Sara W. Clark
Counsel for Plaintiff

*/s/ Alyssa Bixby-Lawson (w/permission)*
Alyssa Bixby-Lawson
Counsel for Defendants

4867-4763-0032

Appendix A



**STATE LEASE**
**20392 Austin**

THE STATE OF TEXAS     §

COUNTY OF TRAVIS     §

1.     PARTIES

This Agreement is made and entered into on this ZZ HD day of __AUGUST__, 2014, by and between LESSOR, **BROADMOOR AUSTIN ASSOCIATES, A TEXAS JOINT VENTURE** and LESSEE, STATE OF TEXAS, acting by and through the Texas Facilities Commission (TFC).

2.     PROPERTY LEASED

**122,123**_____ Total Square Feet (usable), occupied by the

Health and Human Services Commission – OIG_____, located in the

Broadmoor 902_____ at

11501 Burnet Road_____ in

Austin, 78758_____ in

Travis_____, County, Texas

Lessor promises, in return for the consideration described herein to be paid by the Lessee and the covenants set out herein to be kept by Lessee, to hereby lease, unto the Lessee, the Property and Premises described herein.

Lessor also promises to furnish any and all requirements related to such Property and Premises as set out in this lease, all of which are incorporated herein by reference and made a part hereof for all purposes.

3.     TERMS OF LEASE

The term shall be for a period of **120** months commencing on the **later of the 1st** day of **August, 2015** or the Rent Commencement Date (as defined hereinafter in Section 7i), and ending on the **31st** day of **July, 2025** (the Termination Date), unless sooner terminated as hereinafter provided; provided, however, if Substantial Completion (as defined in Section 7(i) below) does not occur by April 3, 2015, then the Termination Date shall be the last day of the 120th month after the Rent Commencement Date. **Subject to the next sentence, this lease is contingent upon the majority approval by a quorum of the**

Commission members of the Texas Facilities Commission. **If the Commission does not approve this Lease at its meeting on August 20, 2014, this Lease shall be null and void for all purposes without further action by either party.**

4.    MONTHLY RENTAL

The Lessee agrees to pay Lessor a base Monthly Rent during the term of this lease in accordance with the Rent Schedule as detailed in Exhibit A. The rental payments provided for herein shall be due and payable by Lessee in advance on the first day of the month for which said rentals are due.

This lease contract is made and entered into in accordance with and subject to the provisions of the Texas Constitution and the Texas Government Code, Title 10, Subtitle D, and is made contingent upon the continuation of the availability of money appropriated by the legislature to pay for the lease.  In the event the Legislature or the Executive Branch of the State of Texas cease to fund the lease, or the agency ceases to exist as a result of the Legislative sunset review process, then the Texas Facilities Commission, hereinafter referred to as Commission, may assign another state agency with comparable use (General Office/Administrative and Professional Services which do not involve on-site customer/client services) to the space, or a part thereof, covered by this lease.  Should the Commission be unable to find another State agency or agencies to fill, or partially fill the space, the Commission, upon written notice to the Lessor, either may terminate this lease, or sublet in whole or in part to a private third party.

5.    RENEWAL OPTION

By mutual agreement between Lessee and Lessor, this lease may be renewed two **(2)** times for a period up to **120** months, under the same terms and conditions except the rental rate, which will be at the then current market rate for comparable space, and that no leasehold improvements other than refurbishment as mutually agreed to shall be provided by Lessor except to the extent reflected in the market rate and Lessee shall have no further renewal options. Lessee shall give Lessor written notice of intention to exercise this option at least 180 days prior to expiration of this lease.

6.    CPI ESCALATION CLAUSE

(a)    On each anniversary date of the lease commencement, the total monthly rent of the lease shall be adjusted by changes in the Consumer Price Index (CPI) reflecting percentage increases.

(b)    To receive the CPI adjustment, the Lessor must submit a request in writing **by certified mail, return receipt requested,** and received by the Texas Facilities Commission (TFC) no later than forty-five (45) days after the anniversary date for that year.  In determining whether to grant Lessor's request for a CPI increase, in whole or in part, TFC may review and consider Lessor's performance under this lease and whether any material or substantive issues with the leased premises of which Lessee has provided prior timely notice to Lessor remain unresolved, as provided in Section 7(k) below.

(c)    The percent escalation allowable will be based on the percent change in the CPI for Urban Wage Earners and Clerical Workers, Current Series (CPI-W, U.S. City Average, All Items) published by the United States Department of Labor, Bureau of Labor Statistics. The index may be obtained from the U.S. Bureau of Labor Statistics web site at **www.bls.gov**.

The index month three (3) months prior the anniversary month for the current year and the previous year shall be used to determine the percent increase.

(d)    A Base Factor of 50% of the monthly rent will be used in the calculation for the escalation in accordance with the following schedule:

Base Factor Percent      Paying Utilities      Paying Janitorial

50%                    Lessor                    Lessor

(e)    **EXAMPLE (Calculation formula with a 50% Base Factor):**

Part 1. <u>CPI Current Year</u>   <u>CPI Previous Year</u>   <u>Difference</u>   <u>Divided by Previous Year</u>   <u>% Change</u>
     (Mar 04) 182.9   -   (Mar 03) 180.3   =   2.6   /   180.3   =   1.4

Part 2. <u>Current Monthly Rent</u>   <u>% Base Factor</u>          <u>% Change</u>   <u>Rent Increase</u>
     $2,500.00   x   50%   = $1,250.00 x   1.4   =   $17.50

Part 3. <u>Current Monthly Rent</u>   <u>CPI Increase</u>   <u>New Monthly Rent</u>
     $2,500.00   +   $17.50   =   $2,517.50

(f)    The first eligible CPI rent adjustment for this lease will be **August 1, 2016**, based upon the percent change in the CPI from **May 2015** and **May 2016** using a Base Factor of **50%.** Each succeeding year, the same procedure as outlined in paragraph (e) above will be used.

7.    GENERAL TERMS AND CONDITIONS

(a)    Lessor covenants and agrees to pay all taxes of whatever nature, levied and assessed and to be levied or assessed, on or against the leased Property and improvements during the term of the lease; and to keep the leased Premises, Property and buildings in good repair and condition during the continuance of the term of this lease, said maintenance is to include, but is not limited to, the following services: repair and patch wall, ceiling and floor surfaces; painting as needed; replacement of broken window glass; repair of window shades, blinds and/or drapes, fasteners and sash cord or chains; roof and ceiling leaks; building exterior, interior; plumbing, heating, air conditioning and ventilating equipment and filters; fire protection equipment; miscellaneous valves; woodwork, locks, floor surfaces and coverings; lighting fixtures, and the replacement of all defective or burned-out light bulbs, fluorescent tubes, ballasts and starters. If the occupying agency, or its agents, cause damage to said Property that goes beyond "normal wear and tear", the occupying agency is responsible to pay for those repairs.

(b)    Lessor hereby covenants and agrees that hereafter and during the term of this lease, it will not rent, lease or otherwise furnish space in this or any adjacent buildings under its control to any enterprise which, in the usual exercise of its business, could be expected to create noise or odors injurious or disruptive to the occupying agency's normal governmental activity. Lessor covenants and agrees it will not lease space that would locate or collocate any regulated parties which have an interest in the occupying agency/ies or whose occupation of these Premises would cause the occupying agency to be in violation of State statute.

(c)    Lessor warrants that the demised Premises is not in violation of any city, state or local ordinance or statute or any restriction imposed against the demised Premises and that said Lessor will indemnify said Lessee for any direct or indirect loss sustained by Lessee as a result of the existence of such restriction, ordinance or statute.

(d)    Lessor hereby covenants and agrees that the Lessee may bring on the leased Premises any and all furniture, fixtures and equipment reasonably necessary for the efficient exercise of Lessee's governmental responsibilities and the parties agree that all such Property shall remain the Property of the Lessee.

(e)    Any signs necessary to indicate Lessee's name, location and governmental purpose shall be prepared and installed consistent with signage for other lessees in the Property and in keeping with building decor. Any special requirements of Lessee contrary to the above must be stated in writing and made a part of this lease. Any cost of compliance with this paragraph in excess of the amount that would be required for Lessor's standard signage shall be borne by Lessee.

(f)    On termination of this lease, by lapse of time or otherwise, Lessee may, within thirty (30) days thereafter, at its option and expense, remove from said Premises any and all improvements, equipment, appliances or other Property placed or owned by it thereon. Lessee shall deliver the Premises and Property to Lessor in good order and condition, provided however, the reasonable use and ordinary wear and tear are expected.

(g)    If during the term of this lease, said Premises, or any portion thereof, shall be condemned for any public purpose, Lessee hereto shall have the option of terminating and canceling this lease upon thirty (30) days' notice to the Lessor of its election to do so.

(h)    It is mutually agreed between the Lessor and the Lessee that if said building and Premises shall, during the term of this lease, be damaged by flood, fire or (any other cause or causes), the same shall be promptly repaired by the Lessor. During the time of such repair, if the space cannot be fully utilized by Lessee, lease payments due hereunder shall be either reduced or withheld in accord with the degree of non-use. But, if said building and Premises be so damaged as to render said Premises unfit for occupancy, then, and from the date of such damage, this lease shall cease and be void; and rent and other obligations hereunder shall be due and payable only to the date of such damage. The determination as to whether the building and Premises are damaged so as to render them unfit for occupancy shall be made by Lessee. If the Lessor has available under his control space which will meet Lessee's needs and offers same to Lessee, the Lessee may at its option, occupy that space under the same terms and conditions as this lease. Lessor will be responsible for any relocation costs that may be incurred, included but not limited to, cost of the space, moving, communications equipment and computer expenses.

(i)    Lessee is not obligated to pay rent and other sums under this lease until 120 days after Substantial Completion ("Rent Commencement Date") provided, however, to the extent Substantial Completion is delayed due to Lessee Delays, the Rent Commencement Date shall be the date that is 120 days after the date Substantial Completion would have occurred but for Lessee Delays.. "Substantial Completion" shall occur, and Lessor shall "Substantially Complete" the premises, when the premises are available to Lessee for full occupancy and the leasehold improvements shown on the approved construction plans (as described in Exhibit B) are substantially complete (specifically excluding Lessee's furniture and other personal property), subject to punchlist items. If Lessor is unable to deliver the premises to Lessee Substantially Complete on April 3, 2015 other than for the reasons set forth in the second paragraph of this Section 7(i), Lessor shall give Lessee immediate written notice of the cause for the delay and the date the premises will be Substantially Complete.

Except as provided in Paragraphs 3 and 4, Lessee may not terminate the lease if the delay of occupancy is caused by Lessee (a "Lessee Delay"), or by conditions beyond Lessor's control (a "Justifiable Delay"), such as strikes, fire, unavoidable casualties or other unusual circumstances beyond Lessor's control that constitutes a justifiable delay.

In the event Substantial Completion has not occurred by April 3, 2015 (provided such date shall be pushed back on a day-for-day basis for each day of Justifiable Delay or Lessee Delay), this lease shall remain in full force and effect for a period following of no less than 180 days. During this time, or for as long as Substantial Completion does

not occur, the rent shall not be paid. During this period, but not to exceed 6 consecutive months, Lessor will be liable to Lessee in damages for any rent payable by Lessee in excess of its current rent paid to its current landlord for its existing location in the building commonly referred to as Braker I located at 11101 Metric Boulevard, Building I, Austin, TX 78758. Lessee shall have the right to offset such excess rent against the first Monthly Rent payment(s) due from and after the Rent Commencement Date until offset in full.

Lessee may terminate this lease without liability to the State of Texas and seek other leased space if Substantial Completion does not occur by October 1, 2015, provided such date shall be pushed back on a day-for-day basis for each day of Lessee Delay and Justifiable Delay.

(j)     Lessee reserves the right to assign any agency of State government to occupy all or any part of the space described herein or to assign or sublet all or any part of the leased Premises to any private entities (persons or corporations) so long as the use is General Office/Administrative and Professional services which do not involve on-site customer/client services.

(k)     In the event Lessor shall breach or be in default in the strict performance of any of the covenants or obligations imposed upon Lessor by this lease, and shall remain in default for a period of thirty (30) days after written notice of such default, Lessee shall have the right and privilege of terminating this lease and declaring the same at an end, and shall have the remedies now or hereafter provided by law for recovery of damages occasioned by such default. In lieu of a formal declaration of default and resulting termination as provided above, Lessee may withhold payment of rent from Lessor, until such time as the violations have been corrected or the Lessee may correct all or any part of the violations and deduct the cost from rentals due the Lessor.

(l)     If Lessee fails to pay rentals or other charges hereunder or otherwise fails to perform its obligations hereunder and this failure is not cured within 30 days after written notice from Lessor to Lessee of such failure, then Lessee is in default, and Lessor may terminate this Lease and may enter and take possession of premises, and will have the remedies now or hereafter provided by law for recovery of rent, repossession of premises and damages occasioned by Lessee's default. No provision, covenant or agreement contained in this Lease shall be deemed a waiver of sovereign immunity of the State of Texas from tort or other liability.

(m)     The failure of the Lessee or Lessor to insist in any one or more instances on a strict performance of any of the covenants of this lease shall not be construed as a waiver or relinquishment of such covenants in future instances, but the same shall continue and remain in full force and effect.

(n)     This agreement and each and all of its covenants, obligations and conditions hereof shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns of Lessor, and the successor in office of Lessee.

(o)     This agreement shall be governed by Texas law.

(p)     Lessor understands that acceptance of funds under this contract acts as acceptance of the authority of the State Auditor's Office, or any successor agency, to conduct an audit or investigation in connection with those funds. Lessor further agrees to cooperate fully with the State Auditor's Office or its successor in the conduct of the audit or investigation, including providing all records requested. Lessor will ensure that this clause concerning the authority to audit funds received indirectly by subcontractors through Lessor and the requirement to cooperate is included in any subcontract it awards.

(q)     Lessor warrants and represents that any use, storage, treatment, or transportation of Hazardous Substances that has occurred in or on the Premises prior to the execution of this Lease has been in compliance with all applicable federal, state, and local laws, regulations, and ordinances. Lessor additionally warrants and represents that no release, leak, discharge, spill, disposal, or emission of Hazardous Substances in violation of environmental laws has occurred in, on, or under the Premises, and that the Premises are free of Hazardous Substances as of the execution of this Lease.

Lessor shall indemnify Lessee from any and all claims, damages, fines, judgments, penalties, costs, liabilities, or losses (including, without limitation, any and all sums paid for settlement of claims and for fees of attorneys, consultants, and experts) arising during or after the lease term from or in connection with the presence of Hazardous Substances in or on the Premises, in violation of applicable environmental laws, unless the Hazardous Substances are present as a result of Lessee or Lessee's agents, employees, contractors, or invitees. Without limitation of the foregoing, this indemnification of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision, unless the Hazardous Substances are present as a result of the acts of Lessee, Lessee's agents, employees, contractors, or invitees. Except for Hazardous Substances on the premises caused by Lessee, its agents, employees, licensees, contractors, or invitees, this indemnification shall specifically include any and all costs due to Hazardous Substances in violation of environmental laws that flow, diffuse, migrate, or percolate into, onto, or under the Premises after the lease term commences.

As used herein, "Hazardous Substance" means any substance that is toxic, ignitable, reactive, or corrosive and that is regulated by any local government with jurisdiction over the Premises, the State of Texas, or the United States Government. "Hazardous Substance" includes any and all material or substances that are defined as "hazardous waste," extremely hazardous waste," or a "hazardous substance" pursuant to any applicable state, federal, or local governmental law. "Hazardous Substance" includes but is not restricted to asbestos, polychlorobiphenyls ("PCBs"), solvents, pesticides, and petroleum.

(r)     At all times during the lease term, Lessor must maintain a policy of all-risk property insurance, issued by and bonded upon an insurance company licensed in the State of Texas, covering the Leased Premises and leasehold improvements (exclusive of contents), in an amount equal to not less than 80% percent of the replacement cost thereof. Lessee shall have no interest in the policy or policy proceeds and Lessor shall not be obligated to insure any furnishings, equipment, trade fixtures, or other personal property that Lessee may place or cause to be placed upon the Leased Premises. Lessor must also maintain a policy or policies of comprehensive general liability insurance insuring Lessor against loss of life, bodily injury and/or property damage with respect to Common Areas, operation of the Building, parking lots and other improvements associated with the land upon which the Leased Premises are located, and any other losses caused by or related to the duties and obligations of Lessor under this Lease.

Lessor acknowledges that, because Lessee is an agency of the State of Texas, liability for the tortious conduct of the agents and employees of Lessee (other than medical liability of medical staff physicians) or for injuries caused by conditions of tangible state property is provided for solely by the provisions of the Texas Tort Claims Act (Texas Civil Practice and Remedies Code, Chapters 1010 and 104), and that Workers' Compensation Insurance coverage for employees of Lessee is provided by Lessee as mandated by the provisions of Texas Labor Code, Chapter 503. Lessor further acknowledges that, as an agency of the State of Texas, Lessee has only such authority as is granted to Lessee by state law or as may be reasonably implied from such law, and that Lessee shall have the right, at its option, to (a) obtain liability insurance protecting Lessee and its employees and property insurance protecting Lessee's buildings and the contents, to the extent authorized by Section 51.966 of the Texas Education Code or other law; or (b) self-insure against any risk that may be incurred by Lessee as a result of its operations under this lease. Any obligation by Lessee under this Lease to obtain insurance is expressly made subject to the

Lessee's authority under state law to obtain such insurance. No insurance carrier of either party shall have a right of subrogation against the other party to this lease.

8.   LEASE REQUIREMENTS

Lessor and Lessee shall comply with all provisions of Exhibit B entitled Lease Requirements which is incorporated herein for all purposes.

9.   OTHER TERMS AND CONDITIONS

(a)   This lease shall be effective as of the date that all parties execute this lease contract. All proposals, negotiations, notices, and representations with reference to matters covered by this lease are merged in this instrument and no amendment or modification thereof shall be valid unless evidenced in writing and signed by all parties as identified below.

(b)   Any statement or representation of Lessee in any Estoppel Certificate delivered pursuant to this lease which would modify the rights, privileges or duties of Lessor or Lessee hereunder shall be of no force and effect and may not be relied on by any person unless otherwise agreed to in writing.

(c)   Should Lessor require Lessee to provide an Estoppel Certificate at any time during the term of this lease, Lessor will give Lessee thirty (30) days prior written notice whereupon TFC will deliver to Lessor a completed signed original of same utilizing its standard Estoppel Certificate form.

10.   SPECIAL PROVISIONS:

1)   Lessor shall design, in consultation with Lessee and in accordance with the schedule for the Lease Requirements outlined in Exhibit B, and construct the additional 20,277 square feet commensurate with the room schedule, specifications, and Exhibits outlined in this Lease, and the cost per square foot to complete the construction of the additional 20,277 square feet shall not exceed on a cost per square foot basis the cost to complete the work defined in Exhibit B.
2)   The Lessor shall provide and maintain a key card system for after-hours access to the Building for the Lessee. Lessee shall be responsible for maintaining and programing the system.
3)   Normal building hours and HVAC are from 7:00 am to 7:00 pm, Monday through Friday, and from 7:00 am to 12:00 pm on Saturdays, exclusive of official State holidays as identified by the State of Texas Comptroller's calendar. After hours HVAC will be charged at the prevailing rate for the building which is currently estimated to be $25.00 per hour per zone. Notwithstanding the foregoing, the Lessor shall provide 24 hour 365 days per year HVAC to the Lessee's Tele/data room at no charge to the Lessee.

*******************************************************************************************



Rev. 11/12

28

Appendix B

LESSOR:

Broadmoor Austin Associates
c/o Brandywine Realty Trust
1501 South MoPac Expressway, Suite 310
Austin, TX 78746
Tel. : (512) 306-1994
Email :

By: _Leon Shadowen_
    Signature

    _Leon Shadowen_
Printed Name

LESSEE:

STATE OF TEXAS,
Acting by and through the
TEXAS FACILITIES COMMISSION
P. O. Box 13047
Austin, TX 78711
Tel.: (512) 463-3160
Fax: (512) 236-6187
Email: jon.conant@tfc.state.tx.us

By: _PETER MAASS_
Peter Maass, Deputy Executive
Director of Planning and Real Estate
Management Division

cc:    Tim Horn, Health and Human Services Commission
       Ginna Harris, Texas Department of Licensing and Regulation
       Regina Roberson, Texas Department of insurance – Fire Safety Inspections, State Fire
       Marshal's Office

EXHIBIT A      RENT SCHEDULE
EXHIBIT B      LEASE REQUIREMENTS
EXHIBIT B1    AGENCY SPECIFIC REQUIREMENTS & ROOM SCHEDULE
EXHIBIT C      GENERAL CONSTRUCTION NOTES
EXHIBIT C1    NEW CONSTRUCTION NOTES



# EXHIBIT A

## RENT SCHEDULE

| OCCUPYING AGENCY | SQ. FT. OCCUPIED | ANNUAL BASE RATE / SF | ANNUAL BASE RENT | MONTHLY BASE RENT |
|---|---|---|---|---|
| HHSC | 122,123 | $32.39 | $3,955,043.04 | $329,586.92 |



Rev. 11/12

30

Appendix B

## EXHIBIT B

### LEASE REQUIREMENTS

(a)     In signing this lease contract, the Lessor certifies that the leased Premises to be occupied shall comply with all applicable federal, state and local laws, statutes, ordinances, codes, rules and regulations, which include compliance with all applicable handicapped accessibility requirements. Acceptance of the space does not exonerate the Lessor from meeting all the requirements. No requirement may be waived by the Lessee or the occupying agency.

(b)     Lessor specifically covenants and warrants that the space will comply with the Texas Accessibility Standards (TAS) requirements during the term of the lease for persons with disabilities administered by the Texas Department of Licensing and Regulations, however any TAS requirements for any work requested by, or performed for, the Lessee in addition to work on the approved plans and specifications as set out in Exhibit B1 shall be paid for by the Lessee.

(c)     Lessor attests that it has sufficient and appropriate title to said Premises and attests that it has the financial capability to fully execute obligations in this lease contract. Lessor further covenants that it has the power and authority to execute this lease and to place Lessee in possession of the Premises in full satisfaction of and compliance with the terms and conditions herein.

(d)     Subject to Lessor's current loan, Lessor also agrees that it will not attempt to impose upon Lessee any requirements of other legal instruments related to these Premises not referred to herein or made a part hereof. Lessor warrants to Lessee the leasehold interest created hereunder and agrees to defend Lessee against the claims of all persons to the leasehold interests of the Lessee. Any person or entity executing this lease as agent for the Lessor shall attach to this lease sufficient evidence of authority to act in the capacity shown.

(e)     **SITE PLAN & CONCEPT FLOOR PLAN DRAWINGS ("Space Plans") shall be provided by Lessor to Lessee upon the full execution of the lease**; Lessor shall provide lessee dimensioned Auto Cad drawing files of the floor plans of the leased premises. Site plan shall show the building footprint and parking lot(s). Lessee shall have five (5) business days to approve Space Plans. Any delays beyond such five (5) day period shall be deemed a Lessee Delay.

(f)     **COMPLETED CONSTRUCTION PLANS ("Construction Plans") shall be provided by Lessor to Lessee 60 days from execution of the lease or earlier**, for Lessee approval prior to commencement of construction. Lessor shall also provide Lessee a construction schedule showing all critical dates of construction or substantial renovation 60 days from execution of the lease and prior to the commencement of construction of the Premises covered by this lease. Lessee shall have five (5) business days to approve Construction Plans. Any delays beyond such five (5) day period shall be deemed a Lessee Delay.

(g)     **SUBJECT TO LESSEE DELAYS AND JUSTIFIABLE DELAYS, ALL CONSTRUCTION, REPAIRS AND ALTERATIONS shall be substantially completed by Lessor 120 days prior to the Rent Commencement Date.** Lessee shall have access to the premises beginning 180 days prior to the Rent Commencement Date to begin cabling and fit up, at no charge to Lessee, in order to prepare the Premises for occupancy, provided such access does not interfere with Lessor's construction. Any delays caused by Lessee's access to such space shall be deemed a Lessee Delay. All non-economic terms and conditions of the Lease shall be in force upon full execution of the lease. Lessee may do whatever is necessary during said period to ensure it is able to commence normal business operations upon occupancy and commencement.

**SUBJECT TO LESSEE DELAYS AND JUSTIFIABLE DELAYS, A CERTIFICATE OF**

**OCCUPANCY (CO)**, issued by the appropriate local authority, shall be provided by Lessor to Lessee **120 days** prior to the Rent Commencement Date. Notwithstanding the above and subject to Lessee Delays and Justifiable Delays, Lessor shall allow Lessee and its contractors access to begin setting up furniture, inclusive of Lessee's modular furniture, and cabling, at Lessee's sole cost and expense, on two (2) mutually agreed upon floors (other than the first floor) 150 days prior to the Rent Commencement Date and provide a Temporary Certificate of Occupancy on such floors no later than March 27, 2015. Any delay arising out of Lessee's or Lessee's contractor's installation of the modular furniture shall be deemed a Lessee delay.

(h)   Lessee reserves the right of inspection and may reject space based on the Premises not being constructed substantially in accordance with the Construction Plans. In addition, any adverse building conditions, including but not limited to general cleanliness, appearance of carpet or tile, grounds, finished interiors or exteriors, odors, pests, insects, or other problems relating to improper extermination or any other condition that would create unsanitary, unattractive or unsafe conditions, will be addressed as part of the punch list.

(i)   As a condition of occupancy, Lessor certifies that the leased space contains the minimum usable square footage specified in the lease contract.

(j)   Lessee shall have the right to survey and inspect Property during the construction process to ensure the leased space complies with all requirements as set forth in this lease agreement.

(k)   Prior to occupancy, Lessor shall thoroughly clean the leased Premises. Cleaning operations shall include, but not be limited to, the following:

1.   Removal of non-permanent protection and labels.
2.   Polish glass of all windows and doors.
3.   Clean exposed finishes.
4.   Clean all mirrors.
5.   Remove all waste and debris.
6.   Clean light fixtures and replace dimmed or burned out light bulbs.
7.   Sweep and wash paved areas as needed.
8.   Clean yards and grounds.
9.   Vacuum all carpeted areas.
10.  Wax and polish all hard surface flooring.
11.  Clean blinds.

(l)   The Lessee may, upon written notice to the Lessor at least 90 days prior to termination of this lease or any extension, remain in possession of the leased Premises for a period specified in the notice, not to exceed 180 days. The Lessee shall pay the Lessor for each month or part of a month, a pro-rata sum equal to the Monthly Rent in effect at the termination of this lease for the space occupied by the agency during this period.

(m)   Lessor shall provide, at Lessor's expense, access to all utilities services, meters, and connections necessary for the proper and intended use of the space. These utilities include telecommunications facilities, continuous hot and cold water, wastewater, electricity and natural gas, if required for heating and or cooling.

(n)   **UTILITIES** shall be paid by **LESSOR.**

Utility bills for telephone, data transmission, and telecommunications will be paid by the Occupying Agencies. The Occupying Agencies' normal weekly hours of operation shall be 7:00 a.m. to 7:00 p.m., Monday through Friday, and 7:00 a.m. to 12:00 noon on Saturday. At Lessee's reasonable request, Lessor shall also make available all utilities at other times necessary at an hourly reimbursement rate based on Building Owners and Managers Association International

32                                    Appendix B

(BOMA) standards, to be provided by the Lessor to the Occupying Agencies prior to award of the Lease. (Currently estimated to be $25.00/hr for OT HVAC)

(o)  **JANITORIAL SERVICES AND SUPPLIES** shall be paid by **LESSOR.**

**LESSOR shall provide JANITORIAL SERVICES AND SUPPLIES, services shall include:**

A.  On a Daily Basis (Monday through Friday; no earlier than 5:00p.m. and must be completed by 7:00a.m. the next work day):
    1.  Vacuum, sweep and/or dust mop all floors and vestibules.
    2.  Detergent mop, rinse, and dry all non-carpeted floors; vacuum carpets and floor rugs; and spot clean carpet and floor rugs as necessary.
    3.  Spot clean around light switches and door levers.
    4.  Clean and disinfect all restrooms, urinals, toilets, wash basins and drinking fountains.
    5.  Empty and clean all restroom receptacles.
    6.  Clean and refill all restroom dispensers.
    7.  Empty and clean waste baskets and place refuse in proper container. Replace trash can and waste basket liners.
    8.  Thoroughly clean break room(s), with cleaning to include, but not limited to, wiping table(s), counter(s), and sink(s).
    9.  Remove all refuse from building and place in proper container(s).
    10. Set security alarm and lock the building after last janitorial employee is out of building, if applicable.

B.  On a Weekly Basis:
    1.  Clean all baseboards and door frames.
    2.  Clean and wash all entrance doors.
    3.  Perform dusting on desks, files, etc.

C.  On a Monthly Basis:
    1.  Perform dusting on all partitions, doors and window ledges.
    2.  Brush down all walls, ceiling vents and light fixtures.
    3.  Clean and wax all desks, if requested by the occupying agency/ies.

D.  On a Semi-Annual Basis:
    1.  Steam clean all carpet and floor rugs.
    2.  Non-carpeted floors to be waxed or buffed.
    3.  Clean fluorescent light lenses and diffusers when needed and/or as requested by Lessee.
    4.  Wash all windows, blinds, glass doors, glass partitions, etc.

E.  Should the Lessee exercise its right to assume janitorial services, the Lessor will continue to provide and pay for the following services:
    1.  Exterior of windows washed twice yearly.
    2.  Daily sanitization of restrooms with germicidal detergent, and restocking of soap and paper products for restrooms that are not within the occupying agency/ies space and for their exclusive use.

(p)  Lessor shall provide and install labels for all individual electrical circuits in all electrical breaker/fuse boxes.

(q)  Lessor shall be responsible for furnishing appropriate outside trash and refuse receptacles and for the removal of trash and refuse from the Premises.

(r)  Lessor shall maintain the exterior of the building and adjacent grounds in an appropriate manner.

Lessor agrees to make diligent efforts to landscape with Texas flora. All grass, trees, shrubbery and other landscaping must be maintained on a regular basis. Water used by Lessor for landscaping and/or decorative purposes shall be paid for by Lessor.

(s)    The Lessor shall provide monthly interior and quarterly exterior pest extermination services. Any extermination service must be performed after normal business hours.

(t)    Lessor shall have building maintenance personnel available to respond to routine calls within twenty-four (24) hours and emergency calls within four (4) hours. "Emergency" repair or maintenance shall include, but not be limited to, situations involving the air conditioning, electrical, plumbing, roof leaks, disruption of water-delivery to or drainage from any portion of the plumbing system, access into and out of the leased space, and environmental control. Lessor shall, at a minimum, acknowledge emergency calls within two (2) hours.

(u)    Space to be occupied under this lease shall be designated a "non-smoking area".

(v)    Lessor shall provide off-street parking for **548** vehicles of which **181** shall be in the parking garage. Parking must be under the direct control of the Lessor and must be located within a reasonable distance of the entry to the lease space. See agency specific requirements for parking.

(w)    Lessor shall furnish and maintain exterior lighting for the building, connecting walkways and parking area(s) as necessary for appropriate security. The light fixtures shall be equipped with a light level-sensing device that will operate the units automatically. Lessor shall provide a minimum level of illumination to comply with normal business standards. Lessor shall pay all utility costs associated with exterior lighting.

(x)    Cost of furnishing and installing light fixtures at inception of lease and replacement light bulbs shall be at Lessor's expense.

(y)    Exit lights, shall be provided to the outside of the building in accordance with applicable codes. Electric and/or luminous directional arrows shall be strategically placed to identify the way leading to the outside.

(z)    Lessor shall provide an emergency lighting system for one and one-half (1-1/2) hours of illumination in the event of failure of normal lighting.

(aa)    Each room and area shall have a light switch.

(bb)    All lighting and electrical accessories shall comply with all Municipal, County, State and Federal ordinances, rules and regulations for any new construction. All electrical work shall conform to the standards and requirements of the latest editions and applicable sections of the National Electrical Code (NEC) Handbook. All lighting fixtures shall have light diffusing panels or elements. Fluorescent lighting fixtures shall have energy efficient ballasts.

(cc)    Lessor shall provide all life safety equipment, including but not limited to fire extinguishers and smoke alarms, in accordance with the requirements of all applicable municipal building codes. In the absence of a local municipal code, Lessor agrees to comply with minimum requirements as set forth by the International Building Code and the Life Safety Code, as published by the National Fire Protection Administration.

Lessor shall provide access to telecommunication and automation service providers under contract to the occupying agencies at appropriate times during construction.

Lessor shall not unreasonably withhold the right of the Lessee to install a security system in the lease space, as requested by the Lessee. The security system shall remain the Property of the

Lessee or occupying agency/ies and may be removed at the end of the lease term.

(ff) All exterior doors shall be keyed with non-duplicating keys. Lessor shall furnish keys, individually numbered, as requested by Lessee. All exterior exit doors shall be solid core doors (where applicable) and equipped, unless otherwise required by code, with deadbolt locks with a minimum one-inch throw bolt. All door hardware and automatic door closers shall be of sufficiently sturdy construction to ensure security.

(gg) All offices and work areas shall have finished ceiling surfaces, unless otherwise approved by Lessee. Broken or stained acoustical tiles shall be replaced by Lessor in a timely manner. Ceiling tiles must be of sufficient quality and weight to not become dislodged due to the opening and closing of doors.

(hh) All demising walls between Lessee space and other tenant space shall be extended from wall to the deck above the finished ceiling at Lessor's expense.

(i) The location of the HVAC unit(s) shall not unduly inconvenience the occupying agency, either due to maintenance requirements or noise levels. Lessor shall furnish a cost efficient central heat and cooling system. The heating and cooling temperatures shall be maintained in accordance to meet the goals of the Energy Management Plan Guide as set forth by the State Energy Conservation Office or TFC. The building must have a mechanical system that provides an indoor environment that is healthful, comfortable and free of objectionable odors. The heating, air conditioning and ventilation system shall comply with the requirements of the latest American Society of Heating, Refrigeration, and Air Conditioning (ASHRAE) Standards for Ventilation for Acceptable Indoor Air Quality (currently ASHRAE 62-1989) and the latest ASHRAE Standards for Thermal Environmental Conditions for Human Occupancy (currently ASHRAE 55-1992). Forced air cooling and heating shall be ducted and vented throughout the space to provide the most efficient manner of operation and occupant comfort. Conditioned air shall be vented into each room and area with the exception of closets. Thermostats shall be provided as necessary to control conditions throughout the leased space. Numbers and locations of thermostats and associated zones or equipment shall accommodate all internal and external loads to provide uniform temperatures throughout the space. HVAC controls/thermostats shall have locking covers and one master key or tool shall be provided to the Occupying Agency. Lessor is responsible for balancing the HVAC system.



Rev. 11/12

35

Appendix B

## EXHIBIT B1

## AGENCY SPECIFIC REQUIREMENTS & ROOM SCHEDULE

Agency Names(s): HHSC    Current Lease # and/or Location: 20085 and 10292 *revised 02/20/14*

| | |
|---|---|
| 1. | Public bus transportation, if such service is provided within the city, is preferred to be within 450 feet of the entrance to the facility site and there must be an accessible route from the property line to the accessible entrance to the building as prescribed in TAS. Any such accessible routes shall be covered with a hard surface material such as concrete, asphalt paving, or comparable surface material. |
| 2. | *Exterior Signage:* Lessor shall be responsible for the exterior sign. For collocated offices, it shall read, **Office of Inspector General**. The Lessor will coordinate exterior signage appearance and placement on the Building eyebrow<br><br>*Interior Signage:* For multi-tenant buildings Lessor shall provide a central directory indicating the location of each occupying agency and shall update the signage within a reasonable time of request from the occupying agency. Interior signage will be more specific, i.e. Health and Human Services Commission, Department of Aging and Disability Services, or Department of Family and Protective Services and so on. Lessor shall be responsible for numbering each room or area within the leased space with TAS compliant signage as specified by the agency. |
| 3. | **Parking:** Lessor shall provide off-street parking spaces. Parking must be under the direct control of the Lessor and must be located within a reasonable distance of the employee entry to the lease space, as determined by Lessee. All parking spaces shall be in close proximity to the proposed building. Accessible parking spaces shall be located as prescribed in TAS. The size of non-handicapped parking spaces shall be in accordance with city code requirements or in the absence of a city code at least 50% of the spaces shall accommodate a full size car. The parking area shall be covered with a hard surface material that is in new or like-new condition and shall drain as to prevent water accumulation if not required by city codes. The lessor shall provide and maintain all parking lot striping. The Lessor shall provide and maintain the parking area in good condition and state of repair and parking area shall be kept clean at all times. Lessor shall furnish exterior lighting for the building and parking area necessary for security and shall keep lighting in good operating condition. The light fixtures shall be equipped with a light level sensitive device that will operate the units automatically. Lessor shall provide a minimum of five foot-candles of illumination. Lessor shall provide 12 reserved parking spaces within the north garage. |
| 4. | Agency prefers contiguous space within a single building. Other space arrangements subject to approval by TFC to ensure occupying agency needs are met. |
| 5. | Multi-story building shall be equipped with 2 automatic elevators, with automatic leveling. |
| 6. | Lessor shall provide adequate access for freight loading and receiving. |
| 7. | *Interior Doors:*<br>All doors shall have door stops.<br>Interior door(s) from the client waiting room shall have automatic door closers.<br>All restroom doors will have automatic door closers. |
| 8. | *Keyed Locks:* The following rooms/doors shall have separately keyed locks provided by the lessor:<br><br>• Exterior doors to the leased premises<br>• Supervisor/Manager office(s) as identified on the room schedule<br>• Storage rooms as identified on the room schedule<br>• Janitorial Closet(s)<br><br>2 keys shall be furnished for each separately keyed lock. Keyed system will require a Master Lock system(s) with 1 Grand Master lock system. |
| 9. | *Client Waiting Area / Reception Area:*<br>Lessor shall furnish chilled water drinking fountains. Drinking water fountains must be located in the Client Waiting Room or be accessible to the Client Waiting Room from a public corridor. |
| 10. | *Client Waiting Area / Reception Area:*<br>Interior door(s) leading from the client waiting area into the office areas shall have a keyless release button(s) mounted where directed by the agency. |
| 11. | *Client Waiting Area / Reception Area:* |

Rev. 11/12

Appendix B

| | |
|---|---|
| | Each door leading from the waiting area to internal hallways within the office area must have a safety glass view as designated by the agency. |
| 12. | **Reception Area:**<br>A panic alarm shall be installed with **1** control switch/button(s) located at the reception area. The control switch/button shall be positioned out of sight beneath the work surface of the workstation/desk(s). A sufficient number of horns/buzzers shall be installed so that when the panic alarm is activated there will be a sound level of not less than 15 dB or more than 25 dB throughout the employee work areas. The control switch/button must have the capability to send a single short alarm or a constant alarm. |
| 13. | **Client Waiting Area Customer Service Counters:**<br>A locking sliding laminated safety glass window shall be installed in the opening at the customer service counter. The window shall be 30" wide by 48" high. All openings shall have non-corrosive trim. |
| 14. | **Electrical:**<br>The agency will designate the locations of equipment and electrical outlets.<br>Lessor shall provide:<br><br>• Electrical service to accommodate vending machines as specified in these agency specifics.<br><br>• Structural support and electrical service for the following agency-provided equipment: **3** TV(s), and **3** other audio visual equipment units as specified by the agency at locations to be determined by the agency. Installation of TVs and other audio/video equipment, including hangers, is the responsibility of the agency. |
| 15. | **Modular Electrical:**<br>Lessor shall provide electrical service for the agency's modular furniture. Unless expressly permitted by the agency, connection to the modular furniture shall be made above the ceiling, through power poles that are part of the modular furniture system. (Note: Agency's modular furniture vendor shall be responsible for installation of said power poles. Lessor shall be responsible for ceiling tile cuts for agency-provided power poles.) Electrical service shall include standard 120-volt service for small office equipment and task lighting, as well as dedicated 120-volt service for computer equipment. Generally, each modular cubicle shall have two (2) standard 120-volt duplex outlets and one (1) computer-dedicated 120-volt duplex outlet. (The outlets are part of the modular furniture system.) For planning purposes, Lessor shall assume that a power pole shall service no more than four (4) modular cubicles. Locations and distribution of modular cubicles may require that a power pole service less than four (4) cubicles. In any event, Lessor will be responsible for providing and connecting electrical service to all agency-provided power poles and/or whips. Lessor shall distribute electrical service so there will be no more than six (6) standard duplex outlets per circuit and no more than six (6) computer-dedicated outlets per dedicated circuit.<br>*(See Attachment A for modular furniture dimensions and electrical requirements.)* |
| 16. | **Conference and/or Training Room(s)**<br>Lighting: Each entrance shall have a light switch to activate the main fluorescent lighting. In addition to the main lighting, Lessor shall provide sufficient recessed lighting controlled by a dimmer switch to provide evenly distributed lighting levels up to 50 foot-candles when the primary fluorescent lights are off. All special feature lighting, etc. switches shall be located together at the front of the room and there shall be one recessed light fixture at the front center connected to a switch for control of this fixture, independent from the primary fluorescent lighting.<br>HVAC: Room(s) will have a separate HVAC thermostat control and will require cooling for the planned occupant load of 20 trainees and trainers. |
| 17. | **Conference and/or Training Room(s):**<br>A folding partition shall be provided to divide the room(s) into two sections. Partitions shall be of such type as to achieve a minimum 40 STC rating. |
| 18. | **Automation Training Room(s):** Automation training room lighting will be provided as follows. Each entrance shall have a light switch to activate the main fluorescent lighting. In addition to the main lighting, Lessor shall provide sufficient recessed lighting controlled by a dimmer switch to provide evenly distributed lighting levels up to 50 foot-candles when the primary fluorescent lights are off. All special feature lighting, etc. switches shall be located together at the front of the room and there shall be one recessed light fixture at the front center connected to a switch for control of this fixture, independent from the primary fluorescent lighting. |

HVAC system shall be separately zoned with its own thermostat and designed for an occupant load of 20 people, 20 computers, 0 printer(s), and 0 multi purpose device (device includes copying, printing, scanning and faxing).

19. **Telephone/Data Closet:**

    A. The room location should be towards the interior of the facility and as near the "core" of the building as possible with no windows. The room must be free from static, magnetic disturbances, and electrical emanations from transformers, electrical switchgear, and fluorescent lights. If IDF rooms are also required, these will be placed one per floor or as designated by the occupying agency.

    B. Lessor shall maintain an ambient room temperature between 65 and 75 degrees Fahrenheit, with relative humidity between 40% and 50%. Lessor shall provide and maintain an air conditioner that is independent of the building HVAC system. This will provide A/C for 24 hours per day, 7 days a week. *(See Attachment B for a list of agency equipment.)*

    C. The room(s) must not be located under or near water or steam pipes. If local codes require sprinklers in the room(s), heads must be high temp and cages are recommended to prevent accidental discharge. Drip pans may be advisable. HVAC units of any kind should not be mounted directly above the room(s) or on walls that also contain/share proximity to HHSC/vendor network and/or phone equipment.

    D. All Telephone/Data electrical outlets must be a dedicated circuit and include isolated grounds for the data demarcations, local area network equipment, and telephone equipment.

    E. Lessor shall provide evenly spaced electrical outlets in the LAN/Telephone room with the following specifications:

        - Two "quad" 5–15/20R T-slot receptacle and two 120-v NEMA L5-30R 2P 3W receptacles (for specialized UPS Systems) on wall marked for telephone and/or LAN demarcation.
        - Two "quad" 5–15/20R T-slot receptacle outlets on wall marked for LAN network equipment.
        - One 2-slot 5–15/20R T-slot receptacle outlet for each identified secondary IDF room.
        - Other (please specify):

    F. Lessor shall provide two conduits: a 3"diameter conduit for telephone service and a 1"diameter conduit for the data circuit both from the access point on building exterior to the facility telephone company room and on to the occupying agency(s) telephone/data closet ending at the D-marc termination noted for the agency(s) plywood designated for the extended D-marcs. Sufficiently sized conduit (each) for voice and data drops will be installed from the telephone/data closet to the occupying agency(s) telephone/data extended D-marcs.

    G. Also required are two #6 solid ground wires attached to a building ground; one is to be installed at the data demarcation point and the other at the telephone demarcation point. These must be located close to the occupying agency's voice and data equipment.

    H. Lessor shall provide and mount 2 sheet(s) of 4 ft. X 8 ft. ¾" fire retardant grade plywood in the Telephone/Data Closet and IDF room(s) if needed, at a location to be determined by the occupying agency.

20. **Break Room:**

*Each Break room will be equipped with the following equipment to be provided by the agency:*

Refrigerators 3 Vending Machines 3 Microwaves 1 Coffee Pots

Counters Break Room countertops should have cabinet space above and below for storage. A standard double sink with a lever handle faucet, hot and cold water and garbage disposal will be

| | |
|---|---|
| | installed in the counter sink. Countertops should include space 24" high, 18" wide and 19" deep for each coffee pot indicated above.<br><br>*Cabinets:* Bottom cabinets shall be 34" high, 24" wide, have drawers at the top with cabinet space underneath with two shelves (including bottom of cabinet). Knee space shall be provided below the sink for handicapped accessibility as prescribed in TAS. There shall be enclosed wall cabinets above the lower cabinets with three shelves (including bottom of cabinet and two adjustable shelves). Upper cabinet shall be located 20" above lower cabinet. Shelving shall be provided for the number of microwaves indicated above.<br><br>Lessor shall install 1" x 8" hardwood chair rail around the perimeter of the room. Chair rail should be at a height designated by the agency. |
| 21. | *Lactation Room:* *(for offices with 75 or more staff)*<br>   A. Room shall have a plastic laminate countertop with a small utility-type sink deep enough to wash bottles and pump parts, and a gooseneck faucet with hot and cold water. A 30-inch wide clear knee space shall be provided beneath the counter along with a bottom cabinet for storage of cleaning supplies and paper towels. Counter shall be a minimum of 20 inches deep and wide enough to provide an adequate work surface for a pump and bottles.<br><br>   B. 120-volt duplex outlets shall be provided on two walls and above the counter. |
| 22. | *Rest Rooms:*<br>Staff Rest Rooms shall be located within the office space. All restrooms shall have a wall mounted baby changing station. Rest room shall have lever handle faucets with hot and cold water and paper towel dispensers. Rest room fixtures will be commercial grade. |
| 23. | Janitor Closet(s) must have a commercial grade floor mounted mop sink with a minimum 24" X 24" X 10" (depth) and commercial grade mop sink faucet with hot and cold water. |
| 24. | **Flooring:**<br><br>Non-slip VCT flooring shall be provided in the following rooms/areas: Restrooms, break rooms, janitor closet<br><br>Lessor shall provide commercial grade carpet tile (24" x 24") in open areas where modular stations will be installed. If lessor does not provide carpet tiles per this requirement then lessor accepts responsibility for the costs of moving furniture and equipment during carpet replacement.<br><br>All other rooms/areas may have roll carpet. |
| 25. | Normal working hours for the occupying agency(s) are 7am to 7pm, Monday thru Friday and 7am to 12 noon on Saturday. This office is anticipated to work additional hours outside of this schedule. For full service leases the lessor will provide TFC an hourly rate for keeping the building open for business. |



Rev. 11/12

39

Appendix B

HHS Modular Furniture Dimensions & Electrical Requirements



6x8 workstation
48 sq. ft.

8x8 workstation
64 sq. ft.

10x8 workstation
80 sq. ft.

## Attachment A



Rev. 11/12

40

Appendix B

# Attachment B
## Telephone/Data Closet Equipment List

| Qty | Equipment | Power Consumption | | Heat |
| --- | --- | --- | --- | --- |
| | | Watts per unit | Total Watts | BTU/Hr total watts x 3.41 |
| 7 | Dell PowerEdge R510 Servers (Dual Power Supplies) | 1,500 | 10,500 | 35,805 |
| 1 | Dell PowerEdge 830 Server | 420 | 420 | 1,432 |
| 3 | Dell PowerEdge 2900 Servers (Dual Power Supplies) | 930 | 2,790 | 9,514 |
| 3 | Dell PowerEdge T320 Servers (Dual Power Supplies) | 1,500 | 4,500 | 15,345 |
| 2 | Dell PowerEdge 2800 Servers (Dual Power Supplies) | 930 | 1,860 | 6,343 |
| 1 | Dell PowerEdge R310 Server (Dual Power Supplies) | 400 | 400 | 1,364 |
| 3 | Dell OptiPlex GX790 Workstations | 250 | 750 | 2,558 |
| 1 | HP LJ1320 Printer | 340 | 340 | 1,159 |
| 1 | Dell PowerEdge 1855 Blade Server Controller | 2,100 | 2,100 | 7,161 |
| 2 | Dell 2161DS KVMs | 13 | 25 | 85 |
| 1 | Dell PowerEdge 6400 Server (Dual Power Supplies) | 640 | 640 | 2,182 |
| 3 | Cisco ASA 5520 Security Appliances | 190 | 570 | 1,944 |
| 2 | Cisco 3750 Gigabit Switches | 84 | 168 | 573 |
| 1 | D-Link 24 port Gigabit Switch | 19 | 19 | 65 |
| 1 | APC Symmetra LX | 11,200 | 11,200 | 38,192 |
| 1 | Buffalo TS-QVH8.0TL/R6 | 86 | 86 | 293 |
| 1 | Buffalo TSH0.0TGL/R5 NAS | 86 | 86 | 293 |
| 1 | LG NAS N2B1DD2 | 44 | 44 | 150 |
| | | totals | 36,498 | 124,458 |



Rev. 11/12

41

# HHSC_OIG Austin Space Program

| | | Full Time Employees | 431 | | | Date | 1/29/14 |
|---|---|---|---|---|---|---|---|
| | Health and Human Services Commission (HHSC) | | | | | | |
| | Office of Inspector General (OIG) | | | | | | |
| | Inspector General | | | | | | |
| 1 | Director (Wilson) | | 1 | 180 | | 180 | office; |
| 2 | Exec Assistant | | 1 | 120 | | 120 | office; adj. to director |
| 3 | Dentist | | 2 | 120 | | 240 | office; |
| 4 | Physician | | 1 | 120 | | 120 | office; |
| 5 | Research & Statistic Techs | | 11 | 80 | | 880 | system furniture |
| | | | | | | | |
| | Enforcement (ENF) | | | | | | |
| 6 | Director (Stick) | | 1 | 140 | | 140 | office; |
| 7 | Specialists - Chief of Staff | | 1 | 120 | | 120 | office |
| 8 | Admin Assist. | | 1 | 80 | | 80 | system furniture; |
| - | Data Analytics & Fraud Detection Unit (DAFDU) | | | | | | |
| 9 | Director (Stansbury) | | 1 | 140 | | 140 | offices; Data Analytics & Fraud Detection Unit |
| 10 | Research Specialists | | 3 | 80 | | 240 | system furniture; |
| 11 | Specialists | | 2 | 80 | | 160 | system furniture; |
| - | General Investigation (GI) | | | | | | |
| 12 | Director (Vacant) | | 1 | 140 | | 140 | office |
| 13 | Managers (Vacant / Vacant/ Compton/Vacant | | 4 | 120 | | 480 | offices |
| 14 | Managers (Neal / Olguin / Boozer) | | 3 | 120 | | 360 | offices |
| 15 | Investigator (lead) | | 2 | 80 | | 160 | system furniture; |
| 16 | Investigators | | 19 | 80 | | 1,520 | system furniture; |
| 17 | Specialists | | 7 | 80 | | 560 | system furniture; |
| 18 | Staff Service Officer | | 1 | 80 | | 80 | system furniture; |
| 19 | Admin. Assist. | | 3 | 64 | | 192 | system furniture; |
| - | Medicaid Provider Integrity (MPI) | | | | | | |
| 20 | Director (vacant) | | 1 | 140 | | 140 | office |
| 21 | Investigator (lead) | | 1 | 80 | | 80 | system furniture; |
| 22 | Managers (Stevens) | | 1 | 120 | | 120 | offices |
| 23 | Nurses | | 12 | 80 | | 960 | system furniture; |
| 24 | Investigators (lead) | | 15 | 80 | | 1,200 | system furniture; |
| 25 | Investigators | | 45 | 80 | | 3,600 | system furniture; |
| 26 | Admin. Assist. | | 2 | 64 | | 128 | system furniture; |
| 27 | Manager | | 4 | 120 | | 480 | office |
| 28 | Attorney | | 1 | 120 | | 120 | office |
| | | | | | | | |
| | Operations (OPS) | | | | | | |
| 29 | Director (Henry) | | 1 | 140 | | 140 | office |
| 30 | Admin. Assist. | | 1 | 64 | | 64 | system furniture; |
| - | Managed Care Organizations (MCO) | | | | | | |
| 31 | Manager (Duflot) | | 1 | 120 | | 120 | office |
| 32 | Specialists | | 5 | 80 | | 80 | system furniture; |
| | Business Operations (Bus OPS) | | | | | | |
| 33 | Director (Ble) | | 1 | 140 | | 140 | office |

Rev. 11/12

42

Appendix B

| 34 | Managers (Porter / Pietrzyk) | 2 | 120 | 240 | offices |
|---|---|---|---|---|---|
| 35 | Xerox Representative | 1 | 120 | 120 | office |
| 36 | Actuary (lead) | 1 | 80 | 80 | system furniture; |
| 37 | Actuaries | 4 | 80 | 320 | system furniture; |
| 38 | Accountant | 1 | 80 | 80 | system furniture; |
| 39 | Financial Analyst | 1 | 80 | 80 | system furniture; |
| 40 | Budget Analyst | 1 | 80 | 80 | system furniture; |
| 41 | Specialists | 6 | 80 | 480 | system furniture; |
| 42 | Property Manager | 1 | 80 | 80 | system furniture; |
| 43 | Admin. Assist. (Receptionist) | 1 | 0 | 0 | 8x8 system furniture; locate staff in Waiting Room |
| - | **Center for Policy and Outreach (CPO)** | | | | |
| 44 | Director (Santos) | 1 | 140 | 140 | office |
| 45 | Specialist | 1 | 80 | 80 | system furniture; |
| 46 | Government Relations Specialist | 1 | 80 | 80 | system furniture; |
| 47 | Manager (Akhtar) | 1 | 120 | 120 | office |
| 48 | Nurse | 1 | 80 | 80 | system furniture; |
| 49 | Training Specialist | 1 | 80 | 80 | system furniture; |
| 50 | Specialists | 4 | 80 | 320 | system furniture; |
| 51 | Manager (Nelson-Wernli) | 1 | 120 | 120 | office |
| 52 | Admin Assist. | 1 | 64 | 64 | system furniture; |
| | CPO - Hotline *Nelson-Wernli's Group* | | | | |
| 53 | Customer Service Rep. (Lead) | 1 | 0 | 0 | 1 - 8' x 10' sys.fum; locate in hotline room |
| 54 | Customer Service Reps | 6 | 0 | 0 | 8 - 8' x 8' system furniture; locate staff in hotline room |
| - | **CPO - Provider Integrity Research (PIR)** *Nelson-Wernli's Group* | | | | |
| 55 | Investigator | 1 | 80 | 80 | system furniture; |
| 56 | Specialist | 1 | 80 | 80 | system furniture; |
| 57 | Research Specialists | 7 | 80 | 560 | system furniture; |
| - | **Technology Analysis Development and Support (TADS)** | | | | |
| 58 | Director (Dekneef) | 1 | 140 | 140 | office |
| 59 | Manager (Clayton / Boardhurst) | 2 | 120 | 240 | office |
| 60 | Specialists | 7 | 80 | 560 | system furniture; |
| 61 | Research Specialist | 1 | 80 | 80 | system furniture; |
| 62 | Specialist - *Dovers Group* | 1 | 80 | 80 | system furniture; |
| 63 | Research Specialists - *Dover's Group* | 8 | 80 | 640 | system furniture; |
| - | **Business Analysis and Support Services (BASS)** *Clayton's Group* | | | | |
| 64 | System Analysts (Lead) | 2 | 80 | 160 | system furniture; |
| 65 | System Analysts | 9 | 80 | 720 | system furniture; |
| 66 | Project Manager | 1 | 120 | 120 | office |
| - | **Research Analysis and Detection (RAD)** | | | | |
| 67 | Manager (Dover) | 1 | 120 | 120 | office |
| 68 | Nurses | 9 | 80 | 720 | system furniture; |
| 69 | Research Specialists | 1 | 80 | 80 | system furniture; |
| | | | | | |
| | **Compliance (COMP)** | | | | |
| 70 | Director (McDade) | 1 | 140 | 140 | office |
| 71 | Admin. Assist. | 1 | 64 | 64 | system furniture; |
| - | **Audit (AUD)** | | | | |
| 72 | Director (Vercolen) | 1 | 140 | 140 | office |
| 73 | Admin. Assist. | 1 | 64 | 64 | system furniture; |
| 74 | Auditors (Lead) | 2 | 80 | 160 | system furniture; |
| 75 | Auditors | 4 | 80 | 320 | system furniture; |

Rev. 11/12

43

Appendix B

| | | | | | |
|---|---|---|---|---|---|
| 76 | Managers (Gauntt; Lane; Rhett) | 3 | 120 | 360 | *offices* |
| 77 | Admin. Assist. (Rhett's Group) | 1 | 64 | 64 | *system furniture;* |
| 78 | Auditor (Lead) | 1 | 80 | 80 | *system furniture;* |
| 79 | Auditors | 12 | 80 | 960 | *system furniture;* |
| 80 | Specialists | 2 | 80 | 160 | *system furniture;* |
| - | **Medicaid / CHIP Audit (MEDI/CHIP)** *Lane's group* | | | | |
| 81 | Auditor (Lead) | 1 | 80 | 80 | *system furniture;* |
| 82 | Auditors | 9 | 80 | 720 | *system furniture;* |
| - | **Medical Review Audit (MED REV)** *Gauntt's group* | | | | |
| 83 | Auditors | 6 | 80 | 480 | *system furniture;* |
| 84 | Admin. Assist. | 1 | 80 | 80 | *system furniture;* |
| 85 | Nurses | 6 | 80 | 480 | *system furniture;* |
| - | **Hospital Audit (HOSP)** | | | | |
| 86 | Managers (Evbayiro; Oliva) | 2 | 120 | 240 | *offices* |
| 87 | Auditors (Lead) | 2 | 80 | 160 | *system furniture;* |
| 88 | Auditors | 22 | 80 | 1,760 | *system furniture;* |
| 89 | Admin. Assist. | 1 | 64 | 64 | *system furniture;* |
| - | **WIC Vendor Monitoring (WIC VEN)** | | | | |
| 90 | Director (Hoffman-Knobloch) | 1 | 140 | 140 | *office* |
| 91 | Auditors | 8 | 80 | 640 | *system furniture;* |
| 92 | Manager | 1 | 120 | 120 | *office* |
| - | **Quality Rev - Util Rev (UR)** | | | | |
| 93 | Manager (Carlson/Vacant) | 2 | 120 | 240 | *office* |
| 94 | Nurses | 8 | 80 | 640 | *system furniture;* |
| 95 | Specialists | 6 | 80 | 480 | *system furniture;* |
| 96 | IT Auditor | 1 | 80 | 80 | *system furniture;* |
| 97 | Nurses *Hoffman-Knoblich group* | 3 | 80 | 240 | *system furniture;* |
| - | **Lock-In Program (LP)** | | | | |
| 98 | Nurses | 2 | 80 | 160 | *system furniture;* |
| 99 | Specialist | 1 | 80 | 80 | *system furniture;* |
| | | | | | |
| | **Internal Affairs (IA)** | | | | |
| 100 | Director | 1 | 140 | 140 | *office* |
| 101 | Admin. Assist. | 1 | 64 | 64 | *system furniture;* |
| 102 | Managers | 6 | 120 | 720 | *offices* |
| 103 | Investigators (lead) | 5 | 80 | 400 | *system furniture;* |
| 104 | Investigators | 16 | 80 | 1,280 | *system furniture;* |
| 105 | Investigators (Forensic Lab) | 3 | 0 | 0 | *(1-8x10) &(4-8x8) system furniture; locate staff in fore lab* |
| 106 | Specialists | 1 | 80 | 80 | *system furniture;* |
| 107 | Admin. Assist. | 2 | 64 | 128 | *system furniture;* |
| 108 | Research Specialists | 4 | 80 | 320 | *system furniture;* |
| | | | | | |
| | **Chief Counsel (CC)** | | | | |
| 109 | Director (Sparks) | 1 | 140 | 140 | *office; adj. to #2, #3* |
| 110 | Attorney | 1 | 120 | 120 | *office; adj. to director* |
| 111 | Specialist | 1 | 80 | 80 | *system furniture;* |
| | **Sanctions (SANC)** | | | | |
| 112 | Director (Pettigrew) | 1 | 140 | 140 | *office; adj. to* |
| 113 | Attorneys | 10 | 120 | 1,200 | *offices; adj. to* |
| 114 | Specialists | 6 | 80 | 480 | *system furniture;* |

Rev. 11/12

44

Appendix B

| 115 | Accountant (Lead) | 1 | 80 | 80 | system furniture; |
|---|---|---|---|---|---|
| 116 | Accountant | 1 | 80 | 80 | system furniture; |
| 117 | Investigators | 6 | 80 | 480 | system furniture; |
| 118 | Admin Assist. | 1 | 64 | 64 | system furniture; |
| 119 | Legal Assistants | 2 | 80 | 160 | system furniture |
| | | | | | |
| | **HHSC IT** | | | | |
| 120 | Contractors | 3 | 80 | 160 | system furniture |
| | | | | | |
| | **Support Areas** | | | | |
| 121 | Waiting Room | 1 | 750 | 750 | at entrance; includes (4 -8'x8' cubicles) for 3 receptic 1 guard and room for mail processing |
| 122 | Open File Area | 1 | 60 | 60 | adjacent to COMP- (LP) Staff |
| 123 | Open File Area | 1 | 100 | 100 | adjacent to COMP- (UR) Staff |
| 124 | Open File Area | 1 | 70 | 70 | adjacent to COMP- (WIC-VEN) Staff |
| 125 | Office Machine Areas | 16 | 45 | 720 | distribute equally to all staff |
| 126 | CPO Hotline Room | 1 | 1,000 | 1,000 | includes staff and workspace in hotline staff; adj. to C CPO staff |
| 127 | IA Forensic Lab | 1 | 850 | 850 | location of Forensic staff; adj. to IA staff |
| 128 | IA Law Enforcement Storage Room | 1 | 500 | 500 | adjacent near IA |
| 129 | DAFDU Room | 1 | 1,000 | 1,000 | adjacent to DAFDU staff |
| 130 | Interview Rooms | 5 | 120 | 600 | adjacent to (2 at GI & MPI staff, 2 at IA staff, 1 near f lobby) |
| 131 | Supply / Storage Room | 1 | 200 | 200 | Central to all staff |
| 132 | IT Storage Room | 1 | 120 | 120 | adjacent to IT staff |
| 133 | MPI Law Enforcement Storage Room | 1 | 500 | 500 | adjacent to MPI staff |
| 134 | Enclosed File Room | 1 | 600 | 600 | adjacent to CC - (SANC) staff |
| 135 | Enclosed File Room | 1 | 700 | 700 | adjacent to OPS - (Bus OPS) staff |
| 136 | Enclosed File Room | 1 | 120 | 120 | Secured; adjacent to OPS - (Bus OPS) staff |
| 137 | Enclosed File Room | 1 | 390 | 390 | adjacent to OPS- (RAD) staff |
| 138 | Enclosed File Room | 1 | 390 | 390 | Secured; adjacent to OPS- (CPO-PIR) staff |
| 139 | Enclosed File Room | 1 | 850 | 850 | Secured; adjacent to ENF-(GI) staff |
| 140 | Enclosed File Room | 1 | 384 | 384 | Secured; adjacent to COMP staff |
| 141 | Enclosed File Room | 1 | 230 | 230 | Secured; adjacent to COMP- (UR) staff |
| 142 | Enclosed File Room | 1 | 480 | 480 | Secured; adjacent to IA staff |
| 143 | Records Storage Room | 1 | 100 | 100 | Secured; adjacent to ENF- (MPI) staff |
| 144 | DPS / TLETS Room | 1 | 90 | 90 | Secured; adjacent to IA staff |
| 145 | Tele/Data Room | 1 | 880 | 880 | central |
| 146 | Audit Training / Lab Rooms | 2 | 150 | 300 | adjacent to Compliance Staff |
| 147 | Audit Training Lab | 1 | 150 | 150 | adjacent to Compliance Staff |
| 148 | Wellness Room | 1 | 224 | 224 | |
| 149 | Hearing Rooms | 5 | 432 | 2,160 | near Sanctions/Chief Counsel |
| 150 | Conference Room (Small) | 2 | 256 | 512 | Central to all staff |
| 151 | Conference Room (Small) | 2 | 160 | 320 | Central to all staff |
| 152 | Conference Room (medium) | 1 | 432 | 432 | Central to all staff |
| 153 | Conference Room (extra large) | 1 | 2,000 | 2,000 | Central to all staff |
| 154 | Training Storage | 1 | 90 | 90 | adjacent to conference and training room |
| 155 | Automation Training/Conference Room | 1 | 520 | 520 | Central to all staff |
| 156 | Conference Room (large) | 2 | 520 | 1,040 | Central to all staff |
| 157 | Conference Room (medium) | 2 | 400 | 800 | Central to all staff |
| 158 | Conference Room (small) | 2 | 200 | 400 | Central to all staff |
| 159 | Lactation Room | 1 | 80 | 80 | near employee restrooms |

Rev. 11/12

45

Appendix B

| 160 | Break Room | 4 | 600 | 2,400 | distribute equally to all staff |
|-----|------------|---|------|-------|--------------------------------|
| 161 | Janitor's Closet | 2 | 60 | 120 | |
| 162 | Vestibule | 1 | 60 | 60 | exterior; unconditioned; at entrance (No circulation included) |
| 163 | Loading Dock | 1 | 100 | 100 | exterior; unconditioned; at rear (No circulation includ |
| 164 | Evidence Storage Room | 1 | 10,000 | 10,000 | Secure; conditioned; adjacent to #163 (No circulation included) |
| 165 | General Investigation (GI) Case Files Storage Room | 1 | 9,000 | 9,000 | Secure; conditioned; adjacent to GI staff (No circul included) |
| 166 | Employees Restroom | | | 0 | per building code |
| | Sub-total | | | 78,412 | |
| | Open Plan Circulation | 50% | | 14,235 | |
| | Built-out Circulation | 30% | | 9,199 | |
| | Total Circulation | | | 23,434 | |
| | OIG SF | | | 101,846 | |
| | HHSC SF | | | 20,277 | |
| | Total SF | | | 122,123 | |

**REST ROOMS** TO BE PROVIDED BY LESSOR IN ACCORDANCE WITH LOCAL BUILDING CODE AND ARE NOT INCLUDED IN THE USABLE SQUARE FOOTAGE OF THIS LEASE.

**Parking requirements:**

| | |
|---|---|
| **Standard Parking Spaces** | **525** |
| **Reserved** | **12** |
| **ADA/TAS** | **11** |
| | **548** |



Rev. 11/12

46

Appendix B

## EXHIBIT C

## GENERAL CONSTRUCTION NOTES

Lessor shall design, in consultation with Lessee, and construct the Premises based upon all of the specifications outlined in this Lease and Exhibits as well as the following criteria at no additional cost to Lessee. Lessor understands that Lessee has no provision for payment of additional construction costs. Any unforeseen costs associated with compliance herein shall be at Lessor's sole cost.

Lessee, not the Occupying Agency of the lease space, has sole authority for the initiation of any changes or modifications (Change Order) to the scope of work contained in this lease.

Should any Occupying Agency cause or request changes by the Lessor to exceed the scope of work described below, Lessor shall first obtain written and signed authorization from the Texas Facilities Commission prior to being obligated to proceed with the work.

1. The space to be occupied must comply with all applicable federal, state, and local laws, statutes, ordinances, codes, rules and regulations. In lieu of applicable local building codes, the International Building Code will apply. Acceptance of the space does not exonerate the Lessor from meeting all the requirements. No requirement may be waived by the Commission or the Occupying Agency.

2. The Leased space shall meet all zoning and building code requirements of the Local Government(s) in which the space is located. Lessor shall comply with all Local Government(s) rules and regulations regarding land development including, but not limited to, subdivision requirements, zoning ordinances, site reviews, plan reviews, development and building permits, inspections, and certificates of occupancy. If Lessor seeks or acquires an exemption from such rules and regulations regarding land development without TFC approval, such action shall be grounds for termination of the lease by the Texas Facilities Commission in accordance with paragraph 7(k) of the State Lease contract.

3. The Texas Accessibility Standards (TAS) requirements for persons with disabilities are administered by the Texas Department of Licensing and Regulation (TDLR), Architectural Barriers Division, P. O. Box 12157, Austin, TX 78711, Telephone: 512-463-3211; web site http//www.license.state.tx.us.

4. Lessee reserves the right to survey or inspect construction/renovation to ensure space complies with all requirements at any time.

5. Any new construction for the Premises shall be constructed by Lessor to conform to New Construction Notes in Exhibit C1 and Lease Requirements outlined in Exhibit B and B1.



Rev. 11/12

47

Appendix B

## EXHIBIT C1

### NEW CONSTRUCTION NOTES

**Initial New Construction:** If requested by Lessee, Lessor agrees to construct, in accordance with the New Construction specifications outlined in this Exhibit.

1. **WALLS**
   - (a) All new interior walls to be taped, bedded, textured and painted. Existing walls to be repainted or cleaned to a like new condition. Color to be selected by tenant.
   - (b) Provide ceramic tiles in Restrooms and Shower Room if applicable.
   - (c) New demising walls shall be full height to structural deck with insulation and fire caulking at all penetrations.

2. **FLOORS**
   - (a) Provide new anti-static VCT, locations to be determined by Lessee.
   - (b) Provide new building standard commercial grade carpet throughout, subject to Lessee approval unless noted otherwise, color to be approved by Lessee.
   - (c) Provide new 4" rubber cover base throughout, color to be selected by Lessee.

3. **CEILING**
   Ceiling grid to be minimum 9'-0" Above Finished Floor (A.F.F.) with new matching 2' x 4' or 2' x 2' ceiling tiles.

4. **DOORS & HARDWARE**
   - (a) Use building standard doors, frames, and lever hardware throughout.
   - (b) Re-paint or re-finish exterior doors and touch-up to like new condition.
   - (c) All entrance, exit and interior doors to meet ADA/TAS required code.

5. **ELECTRICAL**
   - (a) Lessor shall provide 120 volt electrical duplex wall outlets as follows: Walls in excess of twenty feet in length will require one every ten feet. A minimum of one in each hallway; hallways in excess of 50 feet in length will require one every 25 feet.
   - (b) Lessor shall provide ring and string for telecommunication and automation station wiring in walls, ceiling or power poles, as applicable. The Lessee anticipates the need for cable drops at every workstation, office and other areas per the room schedule as will be identified during the Construction Documentation preparation phase.
   - (c) Lessee will connect the furniture to the power and data drops.
   - (d) Lessee shall provide cable. Lessor shall provide all necessary raceway, conduit or pathways per code and pull strings as necessary, to accommodate all work stations, offices etc. per Room Schedule.
   - (e) Lessor shall provide conduit from access point on building exterior to the data/telecom IDF closet for telephone lines and data circuits.
   - (f) All branch circuit ground wires must be tied to a common ground at the distribution panel, to a service ground, or suitable building ground. The conduit must not be the sole means of grounding. The system neutral must be electrically isolated from the ground conductor except at the building ground



station. All branch circuits shall be on the same primary transformer. All dedicated circuits shall be identifiable by use of orange colored plates on the outlets.

(g) Provide adequate electrical for an 8-wire cube for all work stations. Provide j-boxes in the ceiling to feed into power-poles when furniture is not adjacent to a wall or column.

(h) Lessor to provide 120-volt electrical duplex outlets: (these are approx. numbers for preliminary bidding)
   1. (3) in each Office.
   2. (4) in each Storage/Break Room
   3. (1) in each hallway every 25"
   4. (2) in Wait Room
   5. (4) in Reception area
   6. (1) at each ceiling mounted. J-box at each exterior door for tenant provided security system.

(i) Provide sufficient dedicated quad. outlets @ LAN room to meet Lessee's requirements.

(j) Relocate to provide normal office lighting coverage.

(k) All electrical panels are to be labeled with circuits identified to all J boxes to be used for power to furniture, equipment, etc.

(l) To the extent not covered above Lessor shall provide required electrical service to the furniture and equipment identified by the Lessee during the Construction Documentation phase.

(m) Wiring covered by molding carried across open floor will not be permitted.

(n) Building to have standard lighting throughout. (2x4 florescent acrylic lenses or Parabolic desired).

6. **MECHANICAL**

(a) All units will be cleaned to eliminate any debris in all ducts.

(b) Thermostats to be added or relocated shall be approved as to location by Lessee.

(c) Landlord Mechanical Contractor to balance HVAC system if new or redesign, reconfigure and re-balance the existing HVAC system as required and will provide a final report to Lessee.

7. **PLUMBING**

(a) Provide hot and cold water in Break Room(s).

(b) Provide grab bars as per ADA/TAS requirements, paper towel dispensers, soap dispensers, trash receptacles, sanitary napkin dispensers and toilet paper dispensers in all restrooms.

8. **WINDOW TREATMENT**

(a) Provide new building standard window treatment if not existing. Provide blinds if there are no building standard window treatments.

(b) If existing, clean and or replace damaged blinds and window coverings to like new condition.



9.  **MILLWORK**
    (a) Provide upper and lower plastic laminate clad cabinets in break rooms.
    (b) Uppers to have (2) adjustable shelves and lowers to have (1) adjustable shelf.

10. **ADA/TAS**
    (a) Provide opening below sinks to meet ADA/TAS.
    (b) Building must meet all ADA/TAS standards and regulations.
    (c) See required specs, if applicable, indicated on lease.

11. **SECURITY**
    Lessor shall provide conduit/wire pull to boxes located by Lessee for Lessee security system.

**NOTE: Above items are subject to change if noted otherwise on TFC approved Construction Documents.**



Rev. 11/12

50                                                                    Appendix B

CIVIL PRACTICE AND REMEDIES CODE

TITLE 5. GOVERNMENTAL LIABILITY

CHAPTER 114.  ADJUDICATION OF CLAIMS ARISING UNDER WRITTEN

CONTRACTS WITH STATE AGENCIES

Sec. 114.001.  DEFINITIONS.  In this chapter:

(1)  "Adjudication" of a claim means the bringing of a civil suit and prosecution to final judgment in county or state court.

(2)  "Contract subject to this chapter" means a written contract stating the essential terms of the agreement for providing goods or services to the state agency that is properly executed on behalf of the state agency. The term does not include a contract that is subject to Section 201.112, Transportation Code.

(3)  "State agency" means an agency, department, commission, bureau, board, office, council, court, or other entity that is in any branch of state government and that is created by the constitution or a statute of this state, including a university system or a system of higher education.  The term does not include a county, municipality, court of a county or municipality, special purpose district, or other political subdivision of this state.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.002.  APPLICABILITY.  This chapter applies only to a claim for breach of a written contract for engineering, architectural, or construction services or for materials related to engineering, architectural, or construction services brought by a party to the written contract, in which the amount in controversy is not less than $250,000, excluding penalties, costs, expenses, prejudgment interest, and attorney's fees.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.003.  WAIVER OF IMMUNITY TO SUIT FOR CERTAIN CLAIMS.  A state agency that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this chapter waives

sovereign immunity to suit for the purpose of adjudicating a claim for breach of an express provision of the contract, subject to the terms and conditions of this chapter.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.004.  LIMITATIONS ON ADJUDICATION AWARDS.  (a)  The total amount of money awarded in an adjudication brought against a state agency for breach of an express provision of a contract subject to this chapter is limited to the following:
        (1)  the balance due and owed by the state agency under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration if the contract expressly provides for that compensation;
        (2)  the amount owed for written change orders;
        (3)  reasonable and necessary attorney's fees based on an hourly rate that are equitable and just if the contract expressly provides that recovery of attorney's fees is available to all parties to the contract; and
        (4)  interest at the rate specified by the contract or, if a rate is not specified, the rate for postjudgment interest under Section 304.003(c), Finance Code, but not to exceed 10 percent.
    (b)  Damages awarded in an adjudication brought against a state agency arising under a contract subject to this chapter may not include:
        (1)  consequential damages;
        (2)  exemplary damages; or
        (3)  damages for unabsorbed home office overhead.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.005.  CONTRACTUAL ADJUDICATION PROCEDURES ENFORCEABLE. Adjudication procedures, including requirements for serving notices or engaging in alternative dispute resolution proceedings before bringing a suit or an arbitration proceeding, that are stated in the contract subject to this chapter or that are established by the state agency and expressly incorporated into the contract are enforceable, except to the extent those procedures conflict with the terms of this chapter.

Appendix C

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.006.  NO WAIVER OF OTHER DEFENSES.  This chapter does not waive a defense or a limitation on damages available to a party to a contract, other than a bar against suit based on sovereign immunity.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.007.  NO WAIVER OF IMMUNITY TO SUIT IN FEDERAL COURT.  This chapter does not waive sovereign immunity to suit in federal court.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.008.  NO WAIVER OF IMMUNITY TO SUIT FOR TORT LIABILITY.  This chapter does not waive sovereign immunity to a claim arising from a cause of action for negligence, fraud, tortious interference with a contract, or any other tort.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.009.  EMPLOYMENT CONTRACTS EXEMPT.  This chapter does not apply to an employment contract between a state agency and an employee of that agency.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.010.  VENUE.  A suit under this chapter may be brought in a district court in:
        (1)  a county in which the events or omissions giving rise to the claim occurred; or
        (2)  a county in which the principal office of the state agency is located.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.

Appendix C

Sec. 114.011.  LIMITATION ON REMEDIES.  Satisfaction and payment of any judgment under this chapter may not be paid from funds appropriated to the state agency from general revenue unless the funds are specifically appropriated for that purpose.  Property of the state or any agency, department, or office of the state is not subject to seizure, attachment, garnishment, or any other creditors' remedy to satisfy a judgment taken under this chapter.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.012.  EXCLUSIVE REMEDY.  A claim to which this chapter applies may not be brought under Chapter 2260, Government Code, against the state or a unit of state government as defined by Section 2260.001, Government Code.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.


Sec. 114.013.  REPORT.  Before January 1 of each even-numbered year, each state agency shall report to the governor, the comptroller, and each house of the legislature the cost of defense to the state agency and the office of the attorney general in an adjudication brought against the agency under a contract subject to this chapter.  Included in the report shall be the amount claimed in any adjudication pending on the date of the report.

Added by Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586), Sec. 1, eff. September 1, 2013.

Appendix C

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alyssa Bixby-Lawson on behalf of Alyssa Bixby-Lawson
Bar No. 24122680
alyssa.bixby-lawson@oag.texas.gov
Envelope ID: 98557031
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of Appellants
Status as of 3/18/2025 7:32 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Michaelle Peters | | mpeters@scottdoug.com | 3/17/2025 7:22:01 PM | SENT |
| Angela Goldberg | | agoldberg@scottdoug.com | 3/17/2025 7:22:01 PM | SENT |
| Susie Smith | | ssmith@scottdoug.com | 3/17/2025 7:22:01 PM | SENT |
| Jason R.LaFond | | jlafond@scottdoug.com | 3/17/2025 7:22:01 PM | SENT |
| Kemp Kasling | | kkasling@kaslinglaw.com | 3/17/2025 7:22:01 PM | SENT |
| Angie Espinoza | | aespinoza@scottdoug.com | 3/17/2025 7:22:01 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 3/17/2025 7:22:01 PM | SENT |
| Alyssa Bixby-Lawson | | alyssa.bixby-lawson@oag.texas.gov | 3/17/2025 7:22:01 PM | SENT |

Associated Case Party: Broadmoor Austin Associates, a Texas Joint Venture

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Sara W.Clark | | sclark@scottdoug.com | 3/17/2025 7:22:01 PM | SENT |
| Casey Dobson | | cdobson@scottdoug.com | 3/17/2025 7:22:01 PM | SENT |